VANDERBILT et al. v. BISHOP et al.

(Circuit Court, D. Oregon. July 31, 1911.)

(No. 3,647.)

1. CANCELLATION OF INSTRUMENTS (§ 45*)—RESCISSION—FRAUD—EVIDENCE.
A vendee seeking to rescind a contract for the sale of land for fraudulent representations must establish fraud by clear and irrefragable evidence.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 157–193; Dec. Dig. § 45*]

2. VENDOR AND PURCHASER (§ 33*)—CONTRACT OF SALE—RESCISSION—FRAUD.
Misrepresentations sufficient to vitiate a contract for the sale of land, must not only relate to a material matter constituting an inducement to the contract, but to a matter respecting which the vendee did not possess means of knowledge, and it must also be a misrepresentation on which he relied and by which he was actually misled to his injury.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 38–40; Dec. Dig. § 33.*]

3. VENDOR AND PURCHASER (§ 44*)—CONTRACT OF SALE— VACATION— FRAUD—EVIDENCE.
Evidence *held* to require cancellation of a contract for the sale of an orchard for false representations concerning the age and variety of the trees, and the condition and quality of the soil.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 44.*]

4. CANCELLATION OF INSTRUMENTS (§ 58*)—CONTRACT—CANCELLATION—FRAUD—DAMAGES.
Where a contract for the sale of an orchard was canceled for the vendor's fraud, the vendee was entitled to recover the money paid on the contract, with interest from the day of payment, the amount expended in the care and cultivation of the orchard, in addition to costs and disbursements.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 118, 120; Dec. Dig. § 58.*]

In Equity. Bill by Oscar Vanderbilt and another against Minette Thullen Bishop and another, to foreclose a contract for the sale of real estate, in which defendants filed a cross-bill to cancel the contract and for recovery of the money paid thereon for fraud. Bill dismissed, and relief granted on defendants' cross-bill.

On March 22, 1910, Oscar Vanderbilt and wife entered into a contract with Carrie R. Schmick, acting as the agent of Minette Thullen Bishop and Joseph C. Thullen, whereby Vanderbilt and wife agreed to sell to Bishop and Thullen, and the latter agreed to purchase, a certain orchard, the prop-

erty of Vanderbilt, comprising 30 acres, for the price and consideration of $43,000, which said sum Bishop and Thullen agreed to pay in manner following: $1,000 in cash, $9,000 on or before 30 days, $5,000 on or before 90 days, the further sum of $5,000 on December 1, 1910, and the remaining $23,000 on or before five years from the date of the contract, all deferred payments to draw interest at the rate of 7 per cent. per annum from the termination of a period of 90 days after the signing of the contract. It was further agreed that, upon the payment of the $5,000 due December 1, 1910, the vendors should execute to the vendees a deed to the premises, and that the vendees should give a mortgage back as security for the payment of the balance remaining due on the contract. Many other stipulations are set forth, but they are not material to the present controversy. The vendees made the first payment of $9,000, but defaulted on the next following of $5,000. Thereupon Vanderbilt and wife instituted a suit against Thullen and Bishop for a strict foreclosure of the contract; or, if not agreeable to equity, then they pray that the property be sold and the proceeds applied to the payment of the balance of the purchase price. The defendants, denying plaintiffs' right of foreclosure, set up, by way of cross-bill, misrepresentation and fraud on the part of the plaintiff Oscar Vanderbilt and his agent, John Leland Henderson, whereby the defendants were induced to purchase the premises, and pray a rescission. These allegations, being denied, present the real issues of the controversy.

A. J. Derby and John H. Hall, for plaintiffs.

F. V. Holman and A. A. Hampson, for defendants.

WOLVERTON, District Judge (after stating the facts as above). The special matters of fraud alleged are the following, briefly stated:

That Vanderbilt and Henderson, his agent, represented and stated to Carrie R. Schmick, the agent of defendants, that the parcel of land bargained to be sold contained an orchard, planted with apple trees bearing merchantable fruit, and that it was a first-class commercial orchard; that such trees comprised 14 different varieties, and no more; that the land was composed of first-class soil, entirely suitable for the growing of apple trees and the propagation of an apple orchard, and that there was no hardpan thereon; that the net returns from the orchard during the years in which Vanderbilt was the owner were equal to a net income of 20 to 30 per cent. on $43,000 for each year; that the net returns for the year 1908 were $11,332; that the orchard was planted with trees 14 years of age, excepting 50 or 60 trees which had been reset; that said orchard was of the value of $45,000, and had been greatly benefited by deep plowing—which statements and representations were false, so known to Vanderbilt and Henderson, and were made for the purpose of misleading and overreaching defendants, that the defendants relied upon them, and were thereby induced to enter into the contract of purchase. The falsity of such representations is set forth in these particulars, namely: That the orchard is planted with trees 17 years of age instead of 14; that it comprises 24 to 36 varieties instead of 14 only; that the soil is not first-class, suitable for growing apple trees, and without hardpan, but that it is hard and impervious to moisture, and impenetrable to the roots of the trees, and to a great extent consists of hardpan; that the net returns from the orchard were much less than as represented; that the orchard was not benefited by the deep plowing, but on the contrary was irreparably damaged and injured; that the same is not a first-

class orchard planted with trees bearing merchantable varieties of apples, and is not of the value of $45,000, or any greater sum than $20,000.

Reduced to the questions of substance really involved, they are: Was the orchard first-class, and bearing a merchantable commodity? Did it consist in trees of varieties in excess of 14? Were the trees of the age of 17 years instead of 14, and does the soil contain hardpan under any considerable proportion of the area of the orchard? And, if the first of these is to be answered in the negative, or the three latter or any of them in the affirmative, then did Vanderbilt and Henderson knowingly represent to the contrary, and by so doing mislead defendants to their injury?

It is largely a matter of opinion as it respects the estimated value of the property. Also the falsity of the alleged representations touching the profits or net returns previously realized from the orchard has not been shown; nor do I think the issues tendered as to the hurtful results of deep plowing have been sustained. These may therefore be eliminated from further consideration.

There is little dispute in the testimony respecting the merchantable quality of the apples produced, with the exception of some from a few trees only. Not all of them were of choice varieties, but practically all were salable at fair prices. A "standard commercial orchard" has been spoken of in the development of the testimony, but, as defined—it being an orchard with but few varieties of apples, namely, from two to four—the question as to whether the one here is of that class could hardly arise, as it is a thing conceded that it contains 14 varieties and more. It seems that the purchasers, acting through Mrs. Schmick, were in quest of such an orchard, but, on finding this one, purchased it notwithstanding it did not come within the class.

To determine the questions remaining, it will be necessary to review briefly the testimony of the chief witnesses for the parties. Mrs. Schmick was the accredited agent of her father and sister. Of this there is no dispute. John Leland Henderson was the authorized agent for Vanderbilt in the sale of the orchard. Mrs. Schmick, having had some prior dealings with Henderson, came to Hood River in March, 1910, and applied to him (pursuant to an arrangement previously made through correspondence) for a list of the best orchards in the district that he had for sale, and accordingly a list was handed to her. She testifies that her desire so expressed was for a list of "standard commercial orchards." She was without particular or practical knowledge of apple orchards at the time. She subsequently examined all the orchards on the list save the first named (being the one in question here), to which she objected on account of the number of varieties, the list showing 14. Later, however, she made an examination of this orchard also, which, according to her testimony, was brought about by the solicitation of Mr. Allen, who was in business with Henderson, and is referred to as the junior member of the firm. In this connection, it should be stated that Henderson and Allen were associated together as a corporation in the transaction of law business, as well as in real estate. Mrs. Schmick further states that Henderson

represented to her, on numerous occasions, that the Vanderbilt orchard was of the kind indicated by the list. Not only this, but that he discussed with her the advisability of having different varieties, claiming that it was not a detriment to any orchard, the varieties being choice or first-class in quality. He being an orchardist of long experience in that locality, she placed strong reliance upon his statements and judgment. The first time Mrs. Schmick visited the orchard was with a party, Allen having telephoned her that they were going out and asked if she would go along, to which she assented. On the same trip she went to Vanderbilt's home orchard, a half-mile distant, and there talked with him about the orchard in question; in fact, discussed it much in detail. He also said he considered that the fact of numerous varieties was not a detriment, and stated that he had netted $11,-000 from the orchard in 1908. He further represented that the age of the orchard was 14 years, and to her question, "Is there any hardpan in this orchard?" replied, "There is not a foot of hardpan in that orchard," and said, "I will give you a dollar a foot for any you can find." She inquired again, "How deep is the soil?" To which he replied, "Look down the well. You can see how deep the soil is. There is a 50-foot well there." And further remarked, "Why, the trees and the crop would show you that this is perfect soil. I have been an orchardist here for six years, and have a fine orchard of my own, and I certainly know soils of the valley." This was in March, when the trees were dormant, and one could not tell whether they were thrifty or not. The soil looked fine as they were plowing, but Mrs. Schmick claimed to know nothing of soils at the time. Mrs. Schmick wrote at once to her father and sister in California of the favorable representations made by Vanderbilt, but before concluding to close a bargain for the property, she desired to visit the same with Henderson, and so arranged the matter with him. She testifies that she was stopping with Henderson at the time, was confidential with him, and that he took a "fatherly sort of interest" in her, and gave her a great deal of advice about the valley. Henderson's brother became one of the party, at the request of both Mrs. Schmick and Henderson. The brother was from Moscow University, had been in the employ of the United States, and was represented by Henderson to possess a knowledge of orchards. When they arrived out, there was another man in the orchard—Mr. Dethman—and Henderson then said to Mrs. Schmick, "Here is Mr. Dethman, one of the oldest orchardists in the valley, and he cleared this land, rolled the logs, planted the trees; he can tell you anything you want to ask him regarding the orchard—the soil, the trees, anything." On inquiring of Mr. Dethman regarding the trees, and in particular about the soil, he said, "Why, I will give you a dollar a foot for every foot of hardpan in this orchard. I planted these trees myself. I dug the holes. I rolled these logs by hand." Mrs. Schmick asserts that she relied absolutely on his statements. Thereupon she wrote again to her sister, who telegraphed back to make the purchase. In pursuance of the advice, the contract was entered into for a purchase of the orchard at $43,000. There is a dispute in the testimony as to whether Dethman was in the orchard

at the time Henderson and Mrs. Schmick arrived. Both Henderson and Dethman testify that he was in an adjoining orchard—a Mr. Davidson's—and came over of his own accord. Mrs. Schmick further testifies that just before signing the papers, she said to Mr. Vanderbilt, "Now, this orchard is exactly as you have represented it to me in every detail—the trees, the age, the varieties? You will guarantee that it is just as represented?" And he replied, "It is just as I have represented it, and you will get a fine orchard." The papers were then signed up, and the vendees went into possession.

John Leland Henderson testifies, in effect, that a list was requested of his corporation, through correspondence; that Mr. Allen submitted a list of the properties held for sale, which witness thinks he never saw until in court; that Mrs. Schmick and Mrs. Bishop had written to witness that, should they buy any orchards, they would expect him to represent them as their attorney, and that when Mrs. Schmick came in on the occasion mentioned by her, in March, 1910, with a view to buying, he told her that under no conditions would he have anything to do, either directly or indirectly, in advising her with reference to the purchase of any orchard or any piece of ground; that if he was acting as her attorney, he could only attend to the legal part of it; that after she had decided upon what she wished, if she found something that suited her, he would then tell her whether she had made a wise selection or not, but that he wanted to be entirely foot-loose so as to attend to the duties of an attorney without any bias or anything of that character; that such was the understanding between himself and Mrs. Bishop and Mrs. Schmick, which was acted upon throughout the negotiations. Mrs. Schmick went to Henderson's house, at his wife's invitation, and stayed there with the family until the purchase in question was completed. Henderson further testifies that, after Mrs. Schmick had made her investigations, she said to him, "Well, I think of all the orchards I have seen, that I am the most impressed with the Vanderbilt orchard, and I think I will buy it," and he replied to her:

"I think you had better wait and make a careful examination, and decide certain questions. I have been told that there was hardpan in that orchard. I don't know anything about it, for I have never been in the orchard in my life. I have been told that the varieties, the number of varieties of trees in there, are more than you state there has been represented to you. I don't know anything about it. I have been also told that there was some complaint about some rock or hard ground. Now, Mr. E. L. Smith and Dr. Watt owned those places and planted the trees; that is, they controlled the planting of the trees. Mr. Chris Dethman, so I am informed, actually had the charge of planting the trees. Now, there is my brother here, right from Moscow University, who has been employed by the United States Government for years as a horticulturist. He knows orchards. I would advise you to see him. See these other gentlemen. Have an examination of the ground made—see what the character of this is. And I don't want you to come back afterwards and say that this place, if you decide upon buying it, having been sold through a member of our firm, had been misrepresented. You find these things out for yourself, and do not decide now. Wait till to-morrow."

The next day after this conversation, Henderson, his brother, and Mrs. Schmick drove to the orchard. On arriving there, Henderson

further relates, Dethman came over to where they were from David-son's orchard; that Dethman was introduced to Mrs. Schmick, and that he (Henderson) then told her that Dethman had planted the orchard, and that she could ascertain from him about it, "as to the kind of soil, and whether there was any hardpan or anything of the kind there." Henderson further relates, in the same connection, that he had previously telephoned to Vanderbilt, and wished he would have a man there with a shovel to dig holes wherever Mrs. Schmick wanted, but that Vanderbilt had replied that there were 50 or more holes that were recently dug in different parts of the orchard, and that Mrs. Schmick could examine those. The parties walked through the orchard. Mrs. Schmick, during the time, inquired of Dethman about the nature of the ground, and whether he had planted the trees, and all about it. She also conversed with Prof. Henderson as to the general condition of the orchard. Dethman assured her that there was no hardpan in the orchard, as he understood hardpan, and Mrs. Schmick examined the holes to determine for herself. On returning to Hood River, Mrs. Schmick expressed herself as satisfied with the orchard, and Henderson told her that he thought she had made a good purchase. She then authorized Henderson to make an offer to Mr. Vanderbilt of $43,000 in her behalf, which was later accepted, and the negotiations were closed. Henderson affirms that, up to the time she decided to buy, he said not a word to her expressive of his opinion relative to the advisability of her purchasing any particular tract.

On the next day Vanderbilt came over, and after some conference with reference to payments and rate of interest, the contract was signed. In connection with the transaction, Vanderbilt gave to the purchasers a written guarantee that the orchard would produce 10,-000 boxes of apples the following season, and that he would pay to them $1.00 per box for every box falling short of that amount. Some time later Mrs. Schmick and Mrs. Bishop put the orchard into the hands of Henderson for sale, at $2,000 per acre if sold as a whole, or $2,250 per acre if sold in 10-acre tracts. Henderson relates that they said at the time that the proposition was too big for them to handle. The property remained in the hands of the agents for sale for 47 days, when it was withdrawn. On cross-examination, Mr. Henderson further testified that he considered the orchard third-class in the sense of first-class, better than good, and good; that he had heard from one or two parties (mentioning Mr. E. L. Smith and Dr. Watt) that there was hardpan in the orchard, and that he heard Dethman say to Mrs. Schmick, "There is no hardpan in here in this orchard, and I will give you a dollar a foot for every foot of hardpan in this orchard," or words to that effect, and witness did not think that there was any hardpan to be found therein.

Vanderbilt testifies that he purchased the orchard from Dr. Watt, practically five years ago this spring, and that Watt told him that the trees were then 11 and 12 years old; that about a year or a year and a half ago he placed the orchard in the hands of Heilborn for sale at $30,000, and later, the date is not fixed, he placed it in the hands of Henderson for sale at $1,500 per acre; that Mrs. Schmick came to

his house with Mr. Allen, and she talked with him about the orchard; that he told her he had made money out of it; that the first two crops had paid him back the money he had invested; that orchards about Hood River were rated as an investment on the basis of 30 per cent. on $1,000 per acre, and that this orchard would pay from 15 to 20 per cent. on the price he was asking. As to the soil, she asked if there was any hardpan in the orchard, and he told her that Mr. Dethman had grubbed the orchard, and he had offered a party, who had made the contention that it contained hardpan, a dollar a foot for every foot of hardpan he could find in there; that witness had plowed the orchard from the first year he bought it, and at one time on an average of from 12 to 14 inches deep, and that he encountered no hardpan; that the top soil or layer is a loam, or what is called red-shot soil, being a little sandy. Below that it is the same as all soil about Hood River, and a clay subsoil, but that this piece of ground has been cultivated for over 20 years, mostly shallow tillage, that would cause a cake to form in a layer below the surface, and until you go under that with a plow it is hard, but not impervious to water or the roots of trees; that hardpan is a hard clay soil, impervious to water, and no vegetation will penetrate it, and that the only hardpan he had seen in Hood River was the blue clay subsoil; that there is a ridge running diagonally through the orchard, which dries sooner than the rest, but that the trees there are as good as any other place in the tract. The witness, continuing, testifies that he next saw Mrs. Schmick in Henderson's office at the time the contract was closed; that he told her again about the earnings of the orchard, and that he had been able to handle the odd varieties for good prices, by selling independently of the union; that the matter of hardpan was mentioned, and he again told her what Dethman had said—also that she could go to any number of people in Hood River, and probably half of them would have a good word to say and the other half would knock the orchard; that the main varieties were noted on the slip he had given to Mr. Allen, and the others came mostly from resets that had been put in to replace trees which had been removed, but he did not state to her the number; that he stated that the orchard was 13 or 14 years old, which he based upon what Dr. Watt had told him. On cross-examination, he testifies that he bought the orchard in the spring of 1906, and as to the hardpan as follows:

"Q. Now, at that time you stated—you did not give the exact words, but did you not say to her that there is no hardpan in this orchard, and that you would give her a dollar a foot for every foot of hardpan in that orchard? A. No, sir. Q. Well, then, what did you mean that you repeated about what Dethman had said? A. I did that to answer her question, because that was the way I understood it. I heard Mr. Dethman make an offer to a party who stated that there was hardpan in there that he would give him a dollar a foot for every foot he could find. Q. When Mrs. Schmick asked you if there was any hardpan, you told her there was not, did you not? A. That was my answer. My answer was, as I stated, in regards to what Mr. Dethman had told. Q. I didn't ask your means of information. You didn't explain to her that Mr. Dethman said that? A. That was the answer I gave her; what Mr. Dethman had said to this other party. Q. You stated that as your own knowledge, when she asked you if there was hardpan, you stated there was no hardpan? A. I did not. I answered her in that indirect way, as I believed

it at the time, and as I now believe it. Q. What did you state? A. I stated in regard to hardpan that Mr. Dethman—a man who had grubbed the orchard, a neighbor of mine—had stated to a party down town who said there was hardpan in there, that he would give him a dollar a foot for every foot of hardpan he found in the orchard. That was my answer."

These are the principal witnesses who tell about the transaction, but there is corroboration both ways. It will be well, therefore, to ascertain what that corroboration is, and how it affects the case.

C. H. Sproat, who was appointed receiver in the case, gathered the fruit and marketed the same. He testifies that 21 varieties of apples off the orchard went through the union for sale, and there were a few other varieties besides. He further states that in cultivating the orchard he found it in very good condition, excepting a few acres, from five to seven, which lie on a ridge running through the orchard from northeast to southwest. As to this, he says the spring-tooth harrow did not make very much impression, which indicated to his mind that the soil was clay, and had become baked by reason of the work not having been done soon enough; that it was not hardpan, as he understood it; that hardpan, as considered in Hood River, is a layer of soil "of blue clay and impervious to water," underneath a top layer of soil; that he had always heard of it in that way, but did not consider himself an expert. Witness was of the further opinion that the orchard was not first-class as compared with other orchards in Hood River, and that if he were to grade the orchards in that section, he would put them into five classes, and would rate this orchard from medium to good, or medium plus.

Roscoe W. Thatcher, who is a chemist and director of the State Experiment Station of Washington and head of the Department of Agriculture in the State College, testifies that on December 29, 1910, at the request of Mrs. Schmick, he made an examination of the soil. This he did by digging holes in the earth, from 18 to 20 inches deep, in different parts of the tract, and obtaining samples. As a result of his analysis, he says:

"I found the entire orchard having a well-defined dividing-line between the surface and the subsoil. This dividing-line varied in depth from four to twelve inches, apparently at the depth at which the soil had been plowed. Below this line, throughout the entire orchard, was a sharply defined layer of soil which I would class as hardpan. I found, throughout the entire orchard, that the roots of the trees were wholly—practically wholly—above this line of subsoil. * * * The soil is different in different parts of the orchard. The ridge of which I have already spoken is a much heavier clay, red clay, and when wet, as it was at this time, much more plastic and sticky than in the south, extreme southeast corner, and very much more so than in the north and west portions of the orchard. But I found the roots of the trees to be all within the surface layer everywhere that I dug throughout the orchard. The subsoil or hardpan is much harder, and has in it a cementing agent on the ridge, and, so far as I can detect, has no cementing agent in the northerly and westerly parts of the orchard. Q. What is that cementing agent? A. Iron hydrate or carbonate in the ridge. Q. What, approximately, was the area of what you speak of as the ridge? A. I didn't make a careful estimate of its area. Q. Approximately. A. But it appeared to me to be perhaps a little less than one-fourth of the entire orchard. Q. Now, from your observation of this soil and of virgin land adjoining it, what would you say as to what was the cause of this blanket of from four to twelve inches over

the soil? That is, as to whether it was that way naturally, or decomposed, disintegrated, or whether it was due to tillage? A. I thought from my observation that it was due to tillage, and so I went outside the orchard into some raw land, that is, uncultivated land, to the east of the orchard, and there I found no such dividing line. The soil was uniform from the surface downward. Q. And all hardpan? A. It would all be of this type which I would class as hardpan."

On redirect examination, witness continued:

"Q. Now, you spoke about digging these holes, and that the ground was very wet? A. I said it was moist—not very wet. Q. Well, moist. You could, by pressure, dig into this hardpan? A. Yes, sir. Q. But if that hardpan had been dry, it would have been a very different matter, would it not, comparatively dry? A. Particularly on that ridge. When I took the samples home and began to dry them out for the purpose of analysis, I found. in order to prevent their drying into a solid mass, I had to stay right with them and keep breaking them down. I spent one whole evening simply breaking the samples down, by pounding them with a club as they dried. Otherwise, they would have dried into a solid chunk. Q. In other words, in the growing season the tendency of this hardpan is to grow hard, so at last the roots don't penetrate into it? A. I should think so, yes, sir. * * * I think that this whole soil would be hardpan if it had not been moistened at the surface. Hardpan is defined by authorities as being any layer of soil made up of clay, either with or without an admixture of sand and gravel, which is impervious to the entrance of plant roots. * * * In this particular instance, the evidence convinces me that the hardpan would extend clear to the surface of the ground if it had never been tilled, because I found it so in adjoining land which had not been tilled."

E. L. Smith testifies that in the fall of 1892 or spring of 1893 he made a contract with Dethman, concerning the land upon which the orchard in dispute is growing, by which witness was to bear all the expense of planting the orchard, and in consideration thereof Dethman was to deed to him an undivided one-half interest in the land, but in 1895 witness bought the entire interest, and became the sole owner, and that 12 acres were planted in the spring of 1893, and the remaining 18 acres in the following spring of 1894. As to the character of the soil, he says:

"The northern part of the orchard I considered very good soil, and the trees made a fine growth there. When we planted the eighteen acres towards the south part of the orchard, we encountered a good deal of difficulty there. It is a different formation entirely. It is a clay formation, and in digging the holes there, over quite an extended area, after spading out the surface soil. we had to use mattocks and picks to loosen the ground up before it could be taken out. Q. Is there any hardpan in that orchard, Mr. Smith? A. I called that hardpan, where we could not spade it out, and had to use a mattock or a pick. I called that hardpan. Q. Do you call that a first-class commercial orchard, Mr. Smith? A. No, sir, I cannot consider it a first-class orchard."

On cross-examination, witness says he planted the trees in April, when the ground had not yet dried out from the winter rains; that as to the 18 acres, he was disappointed in the soil, and for that reason dug the large holes, thinking it would help out considerably.

A. P. Paasch testifies that he helped plant the orchard; that they dug the holes about three feet in diameter, and from 20 to 22 inches in depth; that they used a long handled shovel and a grub hoe; that they spaded as far as they could with the shovel, and the lower part

they loosened up with the grub hoe, to get the soil out, it being too hard to spade—that was on a ridge running from the east and diagonally through the middle of the orchard. When asked if there was any hardpan in the orchard, witness answered:

"I call it hardpan what I can't spade. * * * This is red clay hardpan."

Witness did not consider it a first-class orchard. He testifies that the surface soil varied all the way from six to eight inches in depth, some places not so much. On cross-examination, he asserts that the clay spoken of as hardpan looks like rusted iron, and is so hard that the roots of trees cannot go through it; that he has seen the roots lying very high up on the surface of the ground; that he has a little patch in his own orchard similar to the ridge spoken of; that he dug the trees out of it, and found the roots all on top of the ground; and that there are some good trees on the Vanderbilt orchard—fair trees—on the north end, but that he would not call the average of them good trees.

Mason G. Fifer testifies that he cultivated the orchard in 1904; that it is a very peculiar soil in some parts, one great fault being that it bakes so hard it is difficult to cultivate, which is especially true of the ridge running through the orchard; that he considers the orchard contains hardpan, which lies more or less all over it, the depth of the surface soil being in some places only four or. five inches, while in other places it is probably nine or ten inches.

Clay S. Prather, of the Corvallis Experiment Station, who has had experience in apple culture in the Hood River district, testifies that he was employed as foreman of the orchard for about two months; that there is hardpan in all of it, with a covering of soil to a depth on the ridge of from 3 to 4 inches, and elsewhere from 12 to 14 inches, and that the area occupied by the ridge is 12 to 15 acres.

George R. Castner, the county fruit inspector, testifies that he made an inspection of the orchard near the middle of June last, and that, in his language, "Many of the trees you can take hold of them with your hand and give them a pull, and lift the roots, as if a good, strong man could pull the tree out. You can see the roots lift right close to the top of the ground. I have taken hold of a good many in that way, and that is the condition." He also states that the indications were that there was a large area of the orchard showing the shallow-rooted condition of the trees—that is, that they sit nearly on top of the ground—but the condition exists in larger measure on the ridge than elsewhere.

On the other hand, C. Dethman, who once owned the land and sold to E. L. Smith, and who assisted in planting the trees, testifies that he was foreman on the work; that 12 or 13 acres were set out in 1894, and the remainder of the orchard in 1895; that in the northern part of the orchard there was no trouble in digging the holes; that in the other part they got in pretty late in the spring, the ground was dry, and they used a mattock and shovel. When asked if there was hardpan under the soil, he answered, "No, sir; what I call hardpan, there is no hardpan," and that "the roots of the trees penetrate in that

ground." The witness relates, further, that he first met Mrs. Schmick at the orchard, and was introduced to her by Mr. Henderson; that he was at the Davidson orchard when Henderson drove up, and that he went over to where they were, it being but a short distance, to talk with him; that on being introduced to Mrs. Schmick, she inquired of him about the character of the soil, whether there was any hardpan in the orchard, and also wanted to know about the trees, their variety, etc., and he says:

"I told her that I offered a dollar for every foot that they could find in that orchard, as far as hardpan was concerned—what I understood to be hardpan."

Witness further says that he believed at the time, and now believes, that there is no hardpan in the orchard; that he showed her the trees, and explained to her the several varieties. He further relates that he dug postholes around the place for fencing, and encountered no hardpan. On cross-examination, he affirms that hardpan is found on low, wet land, where the water cannot penetrate through—that that was what he called hardpan.

Dr. J. F. Watt, who owned the orchard for a while, testifies that he had it cultivated shallow, because that was considered the proper method of cultivation at the time; that he did not consider there was any hardpan under this cultivation, and that there is no soil in the orchard that the roots of trees will not penetrate.

Prof. L. F. Henderson testifies that he went to the orchard at the request of Mrs. Schmick, and acted rather for the protection of her interest; that hardpan was mentioned to Mr. Dethman, and he said. "I think there is no hardpan on this place. Look in those holes;" that Mrs. Schmick and witness did look in the holes, which were about two feet in depth, and the soil looked very good; that in his judgment it would not be impervious to either water or the roots of trees. Witness further explained that if holes of the kind referred to were left through the winter, there would be a breaking up of the hardpan into more or less little pieces—a dropping off from it.

William Ehrck testifies that he owns an orchard adjoining the one in question; that the soil is the same, and that there is no hardpan on his place that he knows of.

Frank C. Dethman testifies that, during the trial of the case, he investigated six trees in the orchard, by digging under to ascertain the nature of the roots, and found that the main roots extended downward into the soil from two to four feet, which was as far as he dug, and beyond. Some of the trees examined were on the ridge spoken of.

The evidence shows that Vanderbilt does not really claim that the orchard is first class, but he does insist that it is a good and profitable orchard, and under proper management would yield a profit of from 15 to 20 per cent. on an investment of $45,000. It is quite probable that his representations in this particular do not go beyond the facts as they exist. Nor am I disposed to place much emphasis upon the specification that Vanderbilt represented the orchard to be first-class. It runs so near along the borderline of opinion, when made with ref-

erence to an orchard under the conditions found to be prevailing in the district, that one cannot be clear in rating it as a statement of an issuable fact upon which alone to predicate a cause for canceling the contract. The alleged representation and the testimony respecting it may, however, be considered along with other alleged misrepresentations, which seem more material to the controversy.

That Vanderbilt represented that the orchard contained but 14 varieties of apple trees appears satisfactorily from the proofs. The list handed to Mrs. Schmick upon her inquiry for a description of the orchards the Henderson Company had for sale shows this. It is of small importance whether the list was handed to her by Henderson, or by Allen or some clerk in the office. It was done with the entire approval of Henderson, who was the agent of Vanderbilt. Not only this, but it was with the express personal approval of Vanderbilt himself, for he made out the list when he put the property in the hands of his agents for sale. So that nothing could be plainer than that this paper containing the list was an apt representation respecting the varieties of the apple trees contained in the orchard. The information was very material to the purchaser, because it bore directly upon the value and utility of the orchard as a business venture. Now, it is conclusively proven that the orchard contains 21 varieties, and more. Such is the testimony of Sproat, the receiver, who gathered and marketed the apples, and it is not seriously disputed. The numerous varieties are accounted for somewhat by reason of the resets put in to replace trees removed; but, however accounted for, the fact remains that the orchard contains many more varieties than as represented, and no plausible, valid or substantial excuse is afforded for making the misrepresentation. Again, this in itself would not be sufficient cause for disturbing the contractual relations between the parties. While material, and somewhat vital, it is not of that especial significance in all its bearings that the court could therefore say that the orchard is not such a one as was bargained for.

Respecting the age of the trees, it is clearly proven that they were 16 and 17 years old at the time of the sale. Vanderbilt's positive representation was that they were 14 years old. This is verified by the list submitted, which was made up by him. There may be a question as to whether Vanderbilt knew their age when he made the representation. However that may be, he made it as though of a fact known to him, and the legal effect is the same. The representation was of a fact essential to the negotiations, and one which was not apparent from an inspection of the trees themselves. It required inquiry beyond that to arrive at the truth—inquiry of persons who had knowledge of the fact. This Mrs. Schmick made no pretense of making.

By far the most serious specification of misrepresentation is respecting the hardpan. I am convinced that the allegations of the cross-bill in this particular are sustained by a clear preponderance of the proof. The testimony of E. L. Smith and of Paasch shows that the hardpan existed on the ridge—much spoken of at the time the orchard was planted; and that of Thatcher, Prather, Fifer and Castner that it exists at the present time. True, Dethman, who superintended setting

the orchard, contradicts Smith and Paasch, and claims that no hardpan exists, but he qualifies that by adding, "as he understands hardpan." It is significant, however, that he relates that it was necessary to use a mattock to break up the ground on the ridge after the top soil had been removed. The time of year was in April when, as Smith says, the moisture had not left the soil. The manner in which the roots of the trees have grown is corroborative of the existence of hardpan. A tree that had been taken out, which shows to a demonstration that the roots could not have run far below the surface, was offered in evidence, and such is the testimony of some of the witnesses. One witness, Mr. Fifer, relates that, while spraying at one time, the wagon was drawn against two of the trees and tipped them over, thus uprooting them. The most convincing testimony is that of Thatcher, who carefully selected samples of the soil, and as carefully analyzed it, and was of the opinion that hardpan existed all over the orchard. While it may not exist so extensively as that, there seems to be little question that it does exist on the ridge described. This occupies a considerable portion of the orchard—from five or six acres, as testified by Dethman, to one-half the area, as asserted by other witnesses. The truth of young Dethman's testimony may be conceded, that he found roots of trees as low in the ground as four feet and still running down. Yet it does not disprove the facts as deposed by other witnesses. Many of the trees, doubtless, rest but slightly below the surface of the ground. Hardpan is defined as a layer of earth near the surface, which is more or less impervious to water and the roots of trees. This is Prof. Henderson's idea of it, with the words "more or less" emphasized. Hilgard says:

"By hardpan is understood a dense and more or less hardened layer in the subsoil, which obstructs the penetration of both roots and water, thus materially limiting the range of the former, both for plant food and moisture." Hilgard on Soils, p. 183.

Whether the strata found especially on the ridge described in this orchard may technically be termed hardpan or not is not very material. It constitutes a serious, if not grievous fault in the soil, and it was a fault known to Vanderbilt. He must have known of it. It was known and talked of in the neighborhood. Of this he was aware, for he cautioned Mrs. Schmick that she would find people who would disparage the orchard, as well as persons who were ready to speak favorably of it. The quality of the strata was in the nature of hardpan; it was more or less impervious to the roots of trees, and would not take the moisture as it ought, as was demonstrated by the experience with the irrigation attempted. So that, technical definition aside, the fault partakes so largely of the characteristics of hardpan as that it may be so termed.

Vanderbilt denies that he represented to Mrs. Schmick that there was no hardpan in the orchard, while Mrs. Schmick testifies positively that he made such a representation. He says in refutation thereof that he told her that Dethman had offered a party who had made the contention a dollar a foot for every foot of hardpan that could be found in the orchard. When Dethman comes to testify, he employs

almost the identical language in relating what he said to Mrs. Schmick on the subject, while he evades saying that he told Mrs. Schmick that the orchard contained no hardpan. Henderson says, however, that Dethman assured her there was no hardpan in the orchard, and Prof. Henderson says he said he thought there was no hardpan.

It will be remembered that Dethman was introduced to Mrs. Schmick by Henderson, who advised her that Dethman could tell her all about the orchard. In this wise, Dethman was made the mouthpiece of both Vanderbilt and Henderson, as they, to all intents and purposes, vouched for his representations. The circumstances lead me to place the greater credence in Mrs. Schmick's testimony on this subject. At any rate, what Vanderbilt and Dethman said to Mrs. Schmick was calculated and intended to lead her to believe there was no hardpan in the orchard, and the consequence was the same as though they had assured her in so many words of the fact. That she relied upon the representation and was misled is asserted by Mrs. Schmick, and I am convinced that such is the case.

When the parties came to close the transaction, Mrs. Schmick insisted upon the execution by Vanderbilt of the guarantee of the production of 10,000 boxes of apples from the orchard. This signifies nothing as to the representations. Vanderbilt declared by the list submitted that he would so guarantee, and the execution of the paper was only in pursuance of that representation.

[1] The law requires of a party seeking the rescission of a contract on the ground of misrepresentation that he establish the same by clear and irrefragable evidence. Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931.

[2] As to the character of misrepresentations that will render nugatory a contract of sale, the law is also well settled. A few excerpts from the authorities will suffice. Says the court in Slaughter's Administrator v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627:

"The misrepresentation which will vitiate a contract of sale, and prevent a court of equity from aiding its enforcement, must not only relate to a material matter constituting an inducement to the contract, but it must relate to a matter respecting which the complaining party did not possess at hand the means of knowledge; and it must be a misrepresentation upon which he relied, and by which he was actually misled to his injury. * * * Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. * * * And the same rule obtains when the complaining party does not rely upon the misrepresentations, but seeks from other quarters means of verification of the statements made, and acts upon the information thus obtained."

Again, says Mr. Justice Brewer, in Farnsworth v. Duffner, supra, quoting from Ludington v. Renick, 7 W. Va. 273:

"If it appears that he (the purchaser) has resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries, or if the means of investigation and verification were at hand, and his attention drawn to them, relief will be denied."

The distinguished jurist then alludes to Pomeroy's analysis of the circumstances under which a party will not be justified in relying upon representations made to him, as follows:

"1. When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement. 2. When, having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence. 3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties."

See, also, Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246.

[3] Now, to apply these rules to the present controversy. It is strongly urged that Mrs. Schmick not only had all the means at her command for ascertaining the true facts pertaining to the orchard, but that she made full and ample investigation thereof upon her own account, and that she cannot now be heard to say that Vanderbilt made the misrepresentations complained of. But is this sustained by the evidence?

Mrs. Schmick, when she came to purchase, had no practical knowledge of the apple industry, nor of the soil suitable for its profitable propagation. True, she says she examined many orchards in Yakima, and in the course of her purchase examined several in Hood River, but she did not thereby obtain either the practical or technical information to make her fairly competent to determine for herself the questions arising as to the quality of the orchard, the variety of the trees growing therein (they being in their dormant state, without foliage or fruit), or the nature, adaptability and productiveness for apple culture of the soil. Touching these three special matters she was constantly seeking information, and her source of inquiry was through Vanderbilt, Henderson, his agent, Prof. Henderson, and Dethman, to the latter of whom both Vanderbilt and Henderson referred her, commending him as the person who could give her the particular information she was seeking. According to Mrs. Schmick's testimony, both Vanderbilt and Dethman assured her that there was not a foot of hardpan in the orchard, the former reassuring her immediately before the transaction was closed. Mrs. Schmick made no independent investigation, outside of the persons mentioned. Prof. Henderson went to the orchard at her request, but it was not until John Leland Henderson had told her that his brother would be a competent person to advise with. Prof. Henderson's investigation consisted in looking into the holes that had been dug upon the premises for the presence of hardpan, and in this he seemed to be at a disadvantage, as the frost, he says, in effect, would cause the clay to disintegrate. In this connection, it may be noted that, when the two Hendersons and Mrs. Schmick were preparing to ride out to see the orchard, Henderson telephoned to Vanderbilt to send over a man with a shovel for digging holes, by which to make the investigation, and Vanderbilt replied that it would not be necessary, as there were holes already excavated in every part of the orchard. These had been excavated for planting trees. Prof. Henderson con-

cluded that the clay or subsoil was not impervious to water or the roots of trees, and therefore that there was no hardpan present. If there was any independent investigation by Mrs. Schmick, it was through the assistance of Prof. Henderson, and yet this was evidently not such an investigation as one relying wholly upon his own judgment would naturally have been prompted to make, and it is reasonable to believe that Mrs. Schmick was depending upon the representations of those concerned in making the sale for the facts upon which to direct her conclusion to purchase. It was not a case where the means of knowledge were available to both parties and the subject of purchase alike open to their inspection, the hardpan being of a nature, and hidden beneath the top soil, that it was not readily discernible; its presence could be verified only by a special and careful examination for that particular purpose, and that by persons familiar with the objectionable soil. Henderson told Mrs. Schmick, according to his own testimony, after the investigation had been made through his brother, that she had made a good selection or "purchase," thereby confirming, if need be, her acquisition of an orchard free from the especial defect she was inquiring about. Henderson claimed, contrary to the testimony of Mrs. Schmick, that he refused absolutely to give her any information as to quality of the orchard, or to advise her at any time whether to buy, and that he was only to pronounce judgment after she had made up her mind as to her choice, and to attend to the legal part of the transaction. He (that is, the Henderson Company, a corporation) was, however, accepting a fee from her for his opinion on the character of purchase and legal advice, while the company was at the same time taking a commission from the vendor for selling the property, and it was through his suggestion that the advice of his brother was sought.

Vanderbilt doubtless knew that the defect was one constituting a serious impediment to a sale, and while it was desirable to dispose of the property—a thing that was his right—yet I think open and fair dealing on his part required of him and his agents, when specific and pointed inquiry was made as to the presence of any hardpan, a frank disclosure of the true condition. Such a course on his part would probably have defeated the sale, and it is for this very reason we must predicate the conclusion that the purchasers were misled to their injury. There were palpable misrepresentations in the three particulars, namely, touching age, variety, and condition and quality of the soil, and, taken as a whole, they were so flagrant and vital as to vitiate the contract.

[4] The decree of the court will be that plaintiffs' complaint be dismissed, and that defendants have judgment, under their cross-bill, for a cancellation of the contract, and that the money advanced by them to plaintiffs under the contract be repaid to them, with interest at the rate of 6 per cent. per annum from the time or times the same was paid to plaintiffs; that defendants further recover from plaintiffs the sum of $1,736.26, being the amount expended in the care and cultivation of the orchard, and their costs and disbursements of this suit to be taxed; and that defendants have a lien upon the premises for the demands found due them.