JOSEPH ANDRIEUX, Respondent, v. E. H. KAEDING, Appellant.

(181 N. W. 59.)

**Fraud — evidence of deceit in sale of mining stock held sufficient.**

1. Defendant sold plaintiff certain corporate stock of the Bessemer Iron Mining Company, and, during the negotiations for the sale thereof, represented to him that the property of said company contained large deposits of manganese ore, and made several other material representations concerning the property and its value, upon which plaintiff relied. The property as a mining proposition proved to be worthless.

Plaintiff brought an action, on the grounds of fraud and deceit, to recover $3,000, the amount which he had paid for the stock, and the verdict was in his favor for that amount and interest.

Held, that there is substantial evidence to support the verdict.

**Evidence — fraud — trial — instructions approved — evidence held admissible — rule of damages stated — nondirection not reversible error.**

2. Held, that the court did not err in excluding or receiving certain evidence, nor in its rulings upon certain objections and motions, nor in the giving of certain instructions.

**Fraud — investigation by purchaser of mining stock held not to preclude recovery for deceit.**

3. Where the property is of such character, or is so situated, that it cannot be examined, as in this case, where the property was alleged to consist of large and valuable deposits of iron ore, to which no shaft had been sunk, and where no exploration records were presented to the party desiring to investigate the property, showing the actual condition existing, a visit to the property, for

47 N. D.—2.

the purpose of inspection, by one about to purchase stock therein, would not preclude him from relying upon the representations theretofore made as to the conditions and value of the property, it appearing that such investigation could convey no knowledge.

Opinion filed December 14, 1920.

Appeal from an order of the District Court of Bottineau County, denying defendant's motion to set aside and vacate the judgment and grant a new trial; Honorable *W. J. Kneeshaw*, Judge.

Judgment affirmed.

*T. D. Sheehan*, and *Miller, Zuger & Tillotson (John Ott*, of counsel), for appellant.

The evidence is insufficient to sustain the verdict.

"Proof of fraud must be by clear and convincing evidence and evidenced by facts inconsistent with an honest purpose." Reitsch v. Mc-Carty (N. D.) 160 N. W. 694.

"Proof of fraud must be by clear and convincing evidence beyond reasonable controversy." Richards v. Millard (Wis.) 131 N. W. 365.

"In an actionable fraud, one of the essential elements to maintain an action is actual or constructive intent to deceive." Milwaukee Worsted Mill v. Wilson (Wis.) 147 N. W. 1068; Humphrey v. Merriman (Minn.) 20 N. W. 138.

"Where purchaser makes as full an investigation as he chooses, he cannot thereafter recover on the ground that he relied upon misrepresentations of the vendor." Roper v. Noll (S. D.) 143 N. W. 130; Moses v. Katzenburger, 84 Ala. 95; Anderson v. McPike, 80 Mo. 293; Development Co. v. Silva, 125 U. S. 247; Farnsworth v. Duffner, 142 U. S. 431; 1 Bigelow, Fraud, 87.

*J. J. Weeks* and *W. H. Adams*, for respondent.

One who buys property has a right implicitly to rely upon the representations of the seller. Guild v. More, 32 N. D. 469; Fargo Gas & Coke Co. v. Co. 4 N. D. 219.

When a certain theory as to the measure of damages or the amount of recovery is accepted or acted upon by the parties in the trial court as the proper one, it must be adhered to on appeal, whether it is correct or not. 3 C. J. 377; Montana Eastern R. Co. v. Lebeck, 32 N. D. 162, Harris v. Van Vranken, 32 N. D. 238; Peterson v. Conlen, 18

N. D. 205; Movius v. Propper, 23 N. D. 452; Lunn v. Seby, 2 N. D. 420.

GRACE, J. This action is one to recover the sum of $3,000, paid to Bessemer Iron Mining Company, while relying upon false and fraudulent representations of defendant, relative to the amount and value of iron ore deposits in certain property, known as the Bessemer Iron Mining Company, a corporation, part of the corporate stock of which was purchased by plaintiff.

The material facts are as follows:

The Crow Wing Iron Company was the owner of the north $\frac{1}{2}$ of the southeast $\frac{1}{4}$ of section 6, township 46, range 29, Crow Wing county, state of Minnesota. The land is in the vicinity where iron ore is found and produced. The Crow Wing Iron Company drilled this property in the year 1911. It does not appear that anything more was done with the property until 1917, when the same was leased to the Bessemer Iron Mining Company, of which one Rydberg was an officer.

The latter company, in 1917, did more drilling on the land. In June of that year the defendant, with other parties, were taken to see the property. Negotiations continued between Rydberg and those parties until October, 1917, when the defendant and other parties of Minneapolis were again taken to see the property. At this time the drilling was finished and some buildings had been constructed, and a shaft was being sunk in the vicinity where some of the drilling had been done. Northeast of this mine, about a mile and a quarter, was the Fay mine, where the shaft had been completed, and from which ore was about to be taken.

Surrounding the Fay mine are other mines, including the Farrell and the Merritt mines, some of which were producing what is denominated manganiferous or manganese ore. Not long after this, the parties from Minneapolis made a contract with the Bessemer people, claimed to be similar to the one into which plaintiff and his associates entered, the only difference claimed was the amount in the first payment, which was less than that provided in the contract which plaintiff signed.

It is claimed that defendant and one Michael paid their first pay-

ment of $500, but the other parties did not make their payments, and the contract was canceled.

In the late fall, in October or November, the defendant met one Vikan of Bottineau, in Minneapolis, and they had some conversation with reference to this mining proposition. Kaeding desired him to bring the matter before parties of Bottineau, with the view of interesting them in the proposition.

Vikan did talk with some parties at Bottineau, and Mr. Smithson went to Minneapolis, made some investigation of the property and conditions, and wrote Vikan thereafter; and sometime after January 9, 1918, after Smithson had talked with defendant, and had some conversation with reference to the latter going to Bottineau, to raise the money for the purpose of sinking a shaft, he did go to Bottineau, and on about the 16th day of January entered into a certain contract. After this contract was signed, one Moline, a contractor, was selected by the parties to take charge of the sinking of the shaft.

After this, and before any money was paid, and at the request of defendant, plaintiff and three other parties to the contract went to the location of the mine for the purpose of investigating the same. They also went to Duluth and had some talk with the manager of the Fay mine, and on the 23d day of January went to Minneapolis, and entered into the contract upon which this action is based, which superseded the contract of January 16th.

The Bessemer Iron Mining Company had a mining lease from the Crow Wing Iron Company, on the land above described. On the 4th day of January, 1918, the former entered into a contract with the defendant and one Michael, whereby it agreed to issue and sell to them, or such other parties as became interested with them, 170,000 shares of the capital stock of that corporation, for the sum of $30,000. That company, according to recital in the contract, theretofore had issued and sold, for promotion and development purposes, 167,915 shares of its capital stock.

The purpose declared in the contract for selling 170,000 shares of stock was the sinking and constructing on the land a shaft, which was to be 100 feet deep, if necessary, and 6 feet wide and 12 feet long, and this for a proper exploration of the property.

Under the contract, the shaft was to be constructed under the joint

direction of all the parties to that contract. The contract contained this further provision: "In consideration of all the covenants of the party of the first part, herein contained, it is further agreed by all of the parties to this contract, that if merchantable ore shall be found upon the property above described, by the sinking of said shaft, in such quantities and quality as to warrant the mining thereof, then said parties of the second part, and said persons selected by said second parties, to become interested with them, may, upon their option, pay to said party of the first part the difference between the total amount of money advanced by said parties of the second part, and those to be hereafter interested with them, as herein contemplated, for the construction of said shaft, in the sum of $30,000, and that, then, thereupon there shall be issued to said parties of the second part, and those to become interested with them, as herein contemplated, 170,000 shares of the capital stock of said party of the first part, divided between the parties of the second part, as their several interests shall appear, according to the amount advanced by each of them."

If, upon the completion of said shaft, merchantable ore in sufficient quantity and quality to warrant the mining thereof shall not be found upon said property, then and thereupon it is agreed by and between the said parties that said party of the first part shall issue to said party to the second part, and divided equally among them, and those interested with them, such shares of the capital stock of the party of the first part as will be paid for by the total amount of money advanced by said parties of the second part, and those interested with them, for the construction of said shaft, at the rate of $30,000 for 170,000 shares.

This contract was signed on the part of the Bessemer Iron Mining Company, by Rydberg, president, and Donahue, secretary, and by Kaeding and Michael, as the other contracting parties. This contract was incorporated into and made a part of the contract involved in this suit, and is executed by Kaeding and Michael, as parties of the first part, and Joseph Andrieux, of Bottineau, and seven other prominent men of that city, engaged, largely, either in the banking or mercantile business, as parties of the second part. The contract provided that upon signing thereof, each of the parties of the second part should pay into the treasury of the Bessemer Iron Mining Company the sum of $1,000, and thereupon there should be issued to him a certificate of

stock of that company, in the sum of $5,000; that on the 1st day of March, 1918, each of the second parties should pay into the treasury the further sum of $500, and a further certificate of stock should be issued to each in the sum of $2,500; and that thereafter the second parties would each pay into the treasury of the corporation, as the same might be required for development purposes, and for the purpose of putting the mining project in operation, such further sums until each had paid into the treasury the total sum of $3,000.

The contract recites that it was understood by the parties to it that the first parties had theretofore paid into the treasury the sum of $2,000 each, and that, after each of the second parties had paid in the sum of $2,000 each, the first parties would pay in the further sum of $1,000 each, as the same might be required in the furtherance of the mining project.

The second parties further stipulated to pay Kaeding the sum of $800 on the 1st day of April, 1918, in consideration of services rendered by him, and money expended in the furtherance of the business of said corporation, and in consideration of legal services theretofore performed, or to be performed, by one Thomas D. Schall, for the corporation, in connection with the business affairs thereof, each of the parties of the second part mutually agreed that from the shares of stock issued to them, they would transfer 300 shares to Schall, or a total of 3,000 shares.

The plaintiff, as per contract, paid for the stock the sum of $3,000. He paid $1,000 on January 25, 1918, $1,000 on March 1, 1918, and $1,000 on March 15, 1918. In his complaint, plaintiff alleges that defendant, in order to induce him to buy the corporate stock, and pay the sum of $3,000 therefor, and with intent to deceive and defraud plaintiff, falsely and fraudulently represented to him, and to the seven other persons to whom he sold said corporate stock, with the intent that they convey such representations to plaintiff, that the debts of said corporation did not amount to more than $4,000 at most; that the said corporation was the owner of a valuable iron mine, which mine contained manganese ore in paying quantities; that the ore in said mine had been tested and found to contain manganese ore in paying quantities; that ore of the kind and quality contained in said mine was worth from $16 to $28 per ton; that the said mine contained as good

manganese ore in as paying quantities as another mine in the same vicinity, which was known as the Fay mine, which contained manganese ore in paying quantities; all of which representations the defendant falsely and fraudulently asserted to be true, although he did not believe them to be true, and although he had no reasonable ground for believing them to be true.

Plaintiff alleges that he relied upon the representations aforesaid, and was induced thereby to join with several other persons in entering into the contract; that the debts of the corporation at the time of entering into the contract amounted to more than $10,000; that the corporation was not the owner of a valuable iron mine; that the mine did not contain manganese ore in paying quantities; that the ore found in the mine was worth nothing, and could be mined only at a loss; that the mine did not contain as good manganese ore as the Fay mine, nor in such paying quantities; that the mine and the corporate stock of the corporation was worthless.

The answer denies the fraudulent representations, or that plaintiff relied upon them, and pleads and relies upon the contract; and alleges that, at the time plaintiff invested his money in the shares of the Bessemer Iron Mining Company, he had made full investigation of the property of the Bessemer Iron Mining Company, and of the possibilities of it, and that it was upon a personal investigation made by him, prior to the signing of the contract and the time he invested his money in the shares, that he was induced to sign the contract to buy the shares. It pleads the $800 which the contract specifies should be paid Kaeding, as a counterclaim. The case was tried to a jury, and verdict returned in plaintiff's favor for $3,000 and interest.

As there are several of the exhibits designated by the same letter, in order to avoid confusion, it is well to explain the exhibits.

The defendant, during the negotiations for the sale of the stock, had and exhibited to plaintiff, and those associated with him, what purported to be a blueprint or map of the Bessemer mining property. At the trial, this was identified as exhibit "A." In the depositions of Ostrand, Vibert, and Wolfe it is identified as exhibit "D."

Besides the above exhibit, there are three blueprints, marked exhibits "A," "B," and "C." These are the original blueprints made for the Crow Wing Iron Company, in 1911, and were in the office of

the Crow Wing Iron Company, at Cloquet, Minnesota, all the time Kaeding was interested in the Bessemer mine.

Two other exhibits are also designated "B" and "C." These are samples of ore taken from the Fay mine, and which the defendant had with him, and exhibited to the plaintiff and his associates at the time of the negotiations for the sale of the stock.

Exhibit "1" is the contract of January 16th. There is also another exhibit "D," which is the contract of January 25th. Exhibit "E" is the report of engineer Wolfe. Exhibit "F" consists of several sheets of blueprint, of cross sections to which reference is made in the testimony of Wolfe.

Exhibit "2" is a letter from Smithson to Vikan, both of whom were parties to the contract.

The defendant has assigned a very large number of errors, thirty-three of which are urged, seven of which are based upon alleged error of the court in giving certain instructions. Fifteen are based upon error claimed to have been committed by the trial court in the reception or exclusion of certain evidence or in its ruling upon objections and motions made during the course of the trial. In eleven, it is contended the evidence is insufficient to support the verdict.

The giving of the following instructions are assigned as error: (1) "As regards the allegations of fraud and misrepresentation charged in this case by the plaintiff, in his declaration filed in this case, the court instructs the jury that to entitle the plaintiff to recover damages in this case the jury must believe, from all the evidence, that the alleged misrepresentations were, in fact, made by the defendant, or some other duly authorized person, and that such representations were false when made; and, further, the jury must believe from the evidence that they were such representations as a man of ordinary prudence would rely upon, and that the plaintiff did, in fact, rely upon such statements, and was induced thereby to purchase the stock in question in this suit, and to execute the contract complained of in this action, and has thereby been damaged. Otherwise, the verdict must be for the defendant."

The correctness of this instruction is challenged on the ground that it is erroneous and misleading, in that it fails to distinguish between representations concerning matters that could only have been expres-

sions of opinion, as distinguished from representations of existing facts susceptible of knowledge. There was no error in the instruction. The evidence clearly shows that the representations were not the expressions of opinion, but of matters claimed to exist as facts, and expressed in such a manner as to warrant the plaintiff in believing that defendant had full knowledge of the facts he represented to be true and to exist.

The subject of fraudulent representations will be more fully analyzed later in the opinion.

(2) "The court instructs the jury that any wilful misrepresentation of a material fact, made with the design to deceive another, and to induce him to enter into a trade he would not otherwise make, will enable the party who has been overreached to annul the contract; and it makes no difference whether the party making the misrepresentation knew it to be false, or whether he was ignorant of the facts stated, provided the matter stated was material to the party making the statement, and stated it as true when, in fact, he had no apparently good reason for believing it to be true, and when the other party, under the circumstances shown by the evidence, was reasonably justified in relying upon the statement and did rely upon it in making the trade, and was deceived and injured thereby."

The defendant claims this instruction is erroneous and misleading in that it is rather in conformity with the equity rule in an action brought for the cancelation of a contract for fraudulent representations, than one where there is an affirmance of the contract and an action for damages.

We think defendant's reasoning is not sound, in this, that the court did not, nor did it intend to, apply the principle of law to which defendant refers. This action is neither for the cancelation of a contract, nor is it one where the contract has been affirmed and then an action maintained for damages for fraud. It is an action for damages for deceit. The complaint states that kind of action.

Section 5943, Comp. Laws 1913, provides: "One who wilfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damages which he thereby suffers. Section 5944. Deceit defined. A deceit within the meaning of the last section is either: (1) The suggestion as a fact of that which is not true by one who does not believe it to be true. (2) The assertion as a

fact of that which is not true by one who has no reasonable ground for believing it to be true. (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, a promise made without any intention of performing."

The instruction defines the proper legal principles applicable to the issues, and in conformity with the statutory definition of deceit and of damages therefor.

The rule of damages in cases like this is that fixed by statute, supra; to wit, the amount of damage suffered by reason of the deceit; and in this case, in view of the allegations of the complaint, it would be no more than the amount of money plaintiff paid for the stock, and the interest thereon from the time of payment.

Perhaps the instruction was not in the best form, but we are certain it was not prejudicial. It was, to a large extent, a statement of our statutory definition of deceit.

(3) "When two or more persons combine to conspire by false representations or other fraudulent acts to cheat and defraud another, all of said persons participating in said fraud are liable to the person defrauded, whether they receive any benefit from the fraud or not."

Defendant contends that this instruction introduces a new element in the case, to wit, that of conspiracy; that it had a tendency to permit the jury to speculate as to whether or not some conspiracy may not have existed between defendant and Rydberg. The language of the instruction states a general principle of law applicable to the facts in it stated. We think there is nothing in the instruction to introduce a new element or a false issue, or that it would cause speculation by the jury in the regard claimed by defendant.

The principal thought in the instruction related to fraud, and not to conspiracy. We think the court was not in error in giving the instruction, but if it could, by any stretch of imagination, be deemed error, it was error without prejudice.

(4) "Now, gentlemen of the jury, there has been some evidence here, as to statements made by and the opinion of Smithson and others, and the court instructs that anything that Smithson or Vikan or any of these fellows may have written, or anything they may have said, or knowledge they obtained, not in the presence of this plaintiff, and

which had not been brought home to him, or which he had not been informed of, are not binding upon the plaintiff in any event. The other parties in this transaction are not suing. It is this plaintiff, Mr. Andrieux, who is bringing this action, and the question is as to what representations were made to him at that time, and whether he relied upon them, and whether they were true. And therefore any letter Mr. Smithson may have written—it not being shown that the plaintiff, Andrieux, knew anything about it at all—is not binding upon him. We are not trying the case of the other parties. We are trying the case of this plaintiff, Andrieux, against the defendant. Those bankers and other men are not in this case at all. They are not suing. It is the plaintiff, Andrieux, who is suing."

The instruction taken as a whole, we think, was a correct statement of the nonadmissibility of statements by, and conversations between, other parties, not made or had in the presence of the plaintiff. It is not shown that plaintiff heard such or that he knew thereof, nor was it shown that he had knowledge of any letters written by Smithson to Vikan, or other letters, if any, between other of the parties, and certainly it must follow that none of the same was binding on him.

Exhibit "2" was a letter written by Smithson to Vikan. It was excluded as evidence, and, we think, properly so; for it does not appear by any competent proof that the plaintiff ever knew of the contents of it. The representations and statements claimed to be facts, or statements expressed in such language and in such manner and circumstances, by the defendant at Bottineau, during the negotiations there with plaintiff and his Bottineau associates, and at Minneapolis when the final contract was executed, and prior to the execution thereof, in the presence of plaintiff and his Bottineau associates, or some of them, were proper and competent evidence, relative to the issue of fraud and of its admissibility, there is not the least doubt. The instruction was only a caution to the jury to consider proper and competent evidence, and to disregard that which was clearly hearsay.

Further objection is made to the instructions, in that it is claimed that the court laid down many abstract propositions of law that had no application to the issues involved, and which were confusing and misleading to the jury; and that the charge failed to instruct the jury as to the law relative to actionable or nonactionable representations.

As to the first objection, there is not the least merit. As to the second, if the representations were false and plaintiff relied on them, and he was deceived thereby, to his injury, and this was the theory upon which the case was tried and submitted to the jury, then the representations were clearly actionable, and the charge, as a whole, defined the law in that regard quite clearly.

It was not necessary for the court to further elucidate the subject by defining nonactionable representations. The court's duty was to define principles of law applicable to the issues. It performed that duty in a most competent and erudite manner; and further, in a civil case, nondirection, unless it amounts to misdirection, is not reversible error. Huber v. Zeiszler, 37 N. D. 556, 164 N. W. 131.

Had the defendant desired further instructions, he should have prepared them in writing, and presented them to the court at a proper time. Not having done so, he is not in position to complain, provided the court has, in its charge to the jury, so amply defined the law applicable to the issues as to fairly cover them; in other words, unless the charge is so devoid of the correct principles of law applicable to the issues that it amounts to misdirection, it should, where there is no requests for further instructions, generally be held to be sufficient.

We will now consider the errors assigned, which are urged, based upon the court's rulings in the reception or exclusion of evidence, and its rulings upon objections and motions. Specification 7 of errors of law.

Ostrand was a mining engineer, of good professional qualifications, and plaintiff's witness. He was asked the following question, to which objection was interposed and overruled:

Q. State, from the examination of that map, exhibit "D," and from your knowledge and experience as a mining engineer, if you know of any purpose for which that map might be used.

By Mr. Sheehan: Defendant objects on the grounds of its being immaterial and purely speculative, and asking the witness to go into the field of conjecture.

A. To mislead.

In his deposition, Ostrand testified, with reference to exhibit "D" (the same as the blueprint, exhibit "A," used in negotiating sale of

stock), in reply to a question wherein he was asked to state, of his own knowledge as a mining engineer, and from the drill records and cross sections on that map, what, if anything, would be the value of the property shown on the blueprint. His answer was that no information is shown on that map to give a basis on which to give an estimate. He was then asked the following question:

Q. Showing the index to ore bodies shown on that map, and referring to map, I will ask you to state if you know of any such formation existing on the Cayuna range, in Crow Wing county, Minnesota, as is shown on that map, plaintiff's exhibit "D."

A. No.

He also stated that the map was of no value except to show the location of property.

As we view this testimony, it is quite material. The map was an instrumentality of deception, except that it might show location of the property. It was of no utility except to use to mislead and deceive as to the true condition which there existed.

This witness shows that the formation shown on this map is not in conformity with any known formation on the range.

J. F. Wolfe, a graduate of the College of Engineering of the University of Wisconsin, and who had an advanced professional degree of Engineer of Mines from that University, and whose course of study embraces engineering and geology of the Lake Superior iron district, and who was from 1908 to 1918 employed as a mining engineer and geologist by the Oliver Iron Mining Company, a mining branch of the United States Steel Corporation, and whose work embraced the Vermilion, Mesaba, and Cayuna ranges of Minnesota, and other ranges, and who was engaged in practice of consulting mining engineering at Duluth and Crosby, testified in reference to exhibit "D," in his opinion the exploration records of this property (Bessemer) did not warrant the making of such a drawing, representing a body of the manganiferous ore on the property; and that, in his opinion, it was drawn from the imagination of the author, without sufficient positive, documentary information, or at the direction of someone employing him; and that, in his opinion, it was made to induce those not familiar with mining properties, or records of mining explorations, to believe that a large

and valuable body of manganese or manganiferous iron ore existed on the property of the Bessemer Iron Mining Company.

Certainly, this evidence was of a high probative value, where the issue is fraud. Exhibit "D" was an instrumentality utilized in the consummation thereof.

Error No. 23: Error is assigned by receiving in evidence, over defendant's objection, exhibits "A," "B," and "C," upon the principal ground that they did not show, or purport to show, the condition of the property as to exploration and development at the time of this transaction.

Fred D. Vibert resides at Cloquet, Minnesota. He was the publisher of a newspaper and was state senator. His testimony is substantially to the following effect: He was connected with the Crow Wing Iron Company, as secretary and director, and that such corporation explored the property in question in 1911; that he preserved the drillings and they were kept at Crosby until the drilling was done, and then were shipped to Cloquet and kept in his office; that these drillings and cuttings were the same as were examined by J. F. Wolfe in his office, in April, 1918; that the chemical analysis of the cuttings and drillings was made by C. J. O'Connell, and that his analysis showed there was some manganiferous ore there, but, as to the quantity, he was not in position to say. He identified the exhibits objected to, "A," "B," and "C," as true.

The witness's testimony shows that he participated in the drilling of the property, by going to Crosby at least once, and sometimes twice, each week while the work was going on, and he was familiar with the detail results of the drilling and explorations done by the Crow Wing Iron Company, on this property.

The defendant claims these exhibits were inadmissible, in that there is a lack of evidence showing the truth or correctness of the matters which those exhibits purport to show; that the party's evidence, who made the analysis of the ore, is not before the court, and that, hence, there is no evidence to show that the figures on exhibits "A," "B," and "C," correspond with the results obtained by the party who made the analysis.

The witness, however, was an officer of the Crow Wing Iron Company, and his testimony is to the effect that those exhibits were true.

At the time of the drilling and exploration by the Crow Wing Iron Company, in 1911, these exhibits were made. There does not appear to be any motive shown why that company should have prepared, by its experts, fallacious blueprints or maps of its drillings and explorations.

The witness was an officer of the company and was in position to have knowledge of the correctness of these exhibits. It is true that upon these exhibits is set forth, in figures or words, a great deal of technical matter, to which, if the witness's attention had been directed, he perhaps could not have qualified as to his actual knowledge of those matters; but he could know, and perhaps did know, at the time the maps were made, that they disclosed the truth, and perhaps it was for this reason that the Crow Wing Iron Company never developed the property.

We think, for the purposes for which the exhibits were introduced in this case, viz., that they showed the true condition of this property in 1911 sufficiently to demonstrate that exhibit "D" was so fictitious and misleading in its entirety, and so misrepresents the actual condition of the property, that it could have been prepared and used for no real purpose other than to deceive as to the true condition which actually existed in the property at the time it was drawn and used in the sale of the stock.

There is testimony showing that the drilling records could not be interpreted by a mining engineer as showing, or proving up, a body of manganese or manganiferous iron ore to exist on the property. We think there was no reversible error in admitting in evidence these exhibits.

Error No. 24 is based upon the reception in evidence of exhibit "E," the report made on this property to the plaintiff and his associates, by J. F. Wolfe, mining engineer.

The objection to the exhibit is that it is based upon information which Wolfe received from the exploration records "A," "B," and "C," and upon conditions which existed in 1911, and not those which existed in 1917.

The report discloses that the property was explored prior to 1914 by the Crow Wing Iron Company, of which one Vibert was an officer. At that time, forty-seven holes were drilled on the property, by Oster-

burg Diamond Drilling Company; that complete samples were kept and stored in ten sample boxes, which samples were taken every 5 feet in ore material.

Analyses were made for iron, phosphorous, and manganese. Special analysis was made of hard ore cores obtained in diamond drilling. Records were made and kept in quite good form of this exploration work; that the property was taken over in 1917 by the Bessemer Iron Mining Company, and that seven additional holes were drilled; that a shaft was started near the last hole drilled; that some of the earlier holes, near the shaft location, showed some fairly high manganese analysis; that there is enough of manganese showing in drill holes 27 and 34, perhaps, to induce one so inclined to take a gambling chance on finding more or better ore in mine workings than is indicated by the drillings.

After a full discussion of many other matters, the report concludes that no body of manganiferous ore of high enough grade and large enough quantity is indicated by the drill records and sample_, as existing on this property; that the body of sandy, washable iron ore which does exist is too narrow, too intermixed with rock, and too irregular to be mined by open pit methods; that the commercial analysis shows that the washable ore cannot be mined, concentrated, and sold at a profit, if mined by underground methods.

We think there was no error in admitting the exhibit. The report was made by a mining engineer of unquestioned ability and experience. It was based upon knowledge acquired from exploration records of the Crow Wing Iron Company, and other information acquired by Wolfe, as shown by his report.

The same sources of information existed during the time Kaeding was engaged in his negotiations with reference to this property. He must have known of what had been done, and of the exploration records, or, at least, he must be held to have known; and where the issues are such as are in this case, we think there was sufficient foundation laid, taking into consideration the exploration records and the expert and scientific knowledge of Wolfe, to warrant the reception in evidence of this exhibit.

Error is based upon the admission of exhibit "F." This is several sheets of blueprints, containing figures purporting to show a chemical

analysis of ore coming from this property. The blueprints were made by Wolfe. The chemical analysis was not made by Wolfe. He does show that the cores and cuttings were examined in the office of Vibert, an officer of the Crow Wing Iron Company. He had made a thorough examination in that regard, in making the report, exhibit "E." He had very extensive knowledge in mining engineering and geology; and considering his wide knowledge of the subject, and his sources of information, and his examination of the exploration records of the Crow Wing Iron Company, we think there was sufficient foundation shown relative to exhibit "F" to permit its introduction as some evidence bearing upon the issues involved here.

The court did not err in denying defendant's motion to instruct the jury to return a verdict in favor of defendant. We cannot further continue a *seriatim* discussion of the errors of law assigned.

We have examined every error of law assigned, based upon the exclusion or reception of evidence and rulings on motions, and hold that the court committed no prejudicial, reversible error in any of its rulings.

We have remaining only the question of the eleven assignments of error, based on the insufficiency of the evidence to sustain the verdict. In disposing of those, it will be only necessary to determine if there is any substantial evidence to support the verdict. If there is, then the judgment must be affirmed.

The principal representations have been set forth in the early part of this opinion, important among which are those to the effect that the corporation was owner of a valuable iron mine, which contained manganese in paying quantities, which had been tested and was of the value of from $16 to $28 per ton, and that the mine contained as good manganese ore, and in as paying quantities, as the Fay mine.

The evidence shows, quite conclusively, that these representations were not the mere expressions of opinion, but, on the contrary, it clearly appears that such expressions and statements were made as expressions of fact. The representations and expressions were made at Bettineau to plaintiff and his associates there, and to him and some of them at Minneapolis, at the time of the signing of the final contract.

The representations made to all who were present on those occasions

47 N. D.—3.

must be deemed to be of the same effect as to each present, as it made to each individually.

We cannot set forth all the evidence, showing what those representations and statements were, but will set forth sufficient, so as to leave no doubt as to the character and meaning of them.

Ferguson testified: "He said he [Kaeding] had all the dope right here, and he showed us a map, similar to this [exhibit 'A'–'D']. There is a vein of ore, he says, which runs according to the drill map here [the light streak]. He showed us that some places they had not gone through it and had gone as far as 340 or 350 feet. With reference to samples 'B' and 'C' [samples of ore from Fay mine] he said one little piece, something like that, and he said if he could get very much of that, we would all be millionaires in a short time. He said it was rare stuff, and only found in small pockets. The other, he said, was just fair ore, if I remember right, and it runs from 8 to 10 to 28 or 30 dollars a ton, according to the amount of manganese it contained. He said this particular mine contained large quantities of ore, similar to that large exhibit [exhibit 'C'] ; he said the drilling showed it. He said the property had been drilled and it showed up good."

This witness further testified: "I think the map showed that some place here [referring to the statement of defendant that in one place they had drilled to a depth of 350 feet and had not gone through the ore], this drill hole here, No. 24, shows 345 feet, and he said they had not reached the bottom of it then."

Part of the plaintiff Andrieux's testimony, in substance, is as follows: Defendant told him he had been looking over the property since June, 1917; that when he first went to the property, there was no road to it; that he had bought 170,000 shares for $30,000, which gave him and his partner, Michael, a controlling interest; that the shaft had been started, and that drillings had been done to explore the property, to see what was there. He got to the ore and showed us the drillings. He got a map (exhibit "A"), showing the drillings, that he said showed a body of iron ore there on that property; showed us where the body of solid ore was, a body of manganese ore, so many feet wide and so many feet deep. The blue print was supposed to show it. He mentioned at one place, they had gone as far as 350 feet and they had not gone through the ore, had not been able to reach the bottom of the ore.

He pointed out this part here (indicating on map) showing over a half mile of ore field, and he pointed to this color (light color) as showing manganese; that he said that the holes, as represented in the map, had been drilled and that every 5 feet of it, when they were drilling it, had been tested, and had proven of good quality of manganese ore; then explained to us what manganese ore was. (Witness identifying exhibits "B" and "C," specimens of ore.) He said that (exhibit "B") was almost pure manganese, the best manganese that could be found, almost pure; that exhibit "C" was more common, and this was the thing that was found on this property, and was selling from 16 to 28 dollars a ton, and that these exhibits came from the Fay mine, which was about a mile and a half from this property; that the ore in that mine was mostly like exhibit "C," but that now and then finding some of this exhibit "B" in pockets; and that the Bessemer Iron Mining Company was on the same vein as the Fay mine, and was of the same quality of ore.

There is abundance of testimony that the statements and representations made by defendant were made as his own positive statement of facts, made as though it were something he knew himself. The plaintiff testified that those statements were not made to him as upon the authority of Rydberg.

In Minneapolis, at the time the contract was consummated, and prior to the signing thereof, at a meeting at which defendant, Rydberg, Vikan, Moline, and the plaintiff were present, plaintiff asked Rydberg, "Wasn't this property that we looked over drilled by the Crow Wing Iron Company?" And he said, "Yes;" and plaintiff said, "Do you have the drilling records and test records of those explorations taken by those people?" and he said "Yes, we have." Plaintiff asked Rydberg where the drillings and test records of the Crow Wing Iron Company were, and he said at Duluth; and Kaeding says, "Yes, we have all that. They are all right; everything is all right." Plaintiff testified that he relied upon all the representations and statements.

It is entirely unnecessary to pursue an analysis of the testimony in this regard any further. It is abundant to show the representations by defendant, as claimed by plaintiff. The evidence is quite sufficient to show that such representations were false, and that plaintiff was deceived thereby. His damages are conclusively proven.

Of course, plaintiff's testimony, and that of his witnesses, is generally contradicted by the defendant's evidence, but the credibility of the witnesses, and the weight to be given their testimony, is exclusively for the jury. Its verdict is in favor of plaintiff, and that verdict is amply sustained by substantial evidence.

It is defendant's contention that plaintiff had full opportunity to examine the property before he made the final contract. It is true that plaintiff and several of his associates did go down to the property for the purpose of examining it, but, on account of the character of the property, and the fact that the shaft was only down a few feet, there was nothing for plaintiff to see but a hole in the ground. The condition of the property at that time, as shown to exist by the testimony, was such that plaintiff could not, however searching his examination might be, discover anything which would aid him in determining the value of the property. In these circumstances, he waived none of his rights by his visit of inspection to the property.

We do not find it necessary to discuss the representation relative to the amount of debts to the Bessemer Iron Mining Company at the time of the sale of the stock.

It is clear the judgment is right and should be affirmed. It is affirmed. Respondent is entitled to his costs and disbursements on appeal.

ROBINSON, J., concurs.

BRONSON, J. I concur in result.

BIRDZELL, J. (concurring). I concur in an affirmance of the judgment. Upon an examination of the record I am of the opinion that there are but two questions presented which merit the serious consideration of the court. The first arises upon the rulings of the court admitting exhibits A, B, C, E, and F. The first three exhibits consist of test sheets purporting to show the results of a test of the property in question made long prior to the transactions involved in this case, and E and F consist of a report of an engineer employed by the Bessemer Iron Mining Company and its accompanying blueprints. Exhibits E and F are based partly upon the test sheets A, B, and C.

The second is the question as to whether or not the plaintiff pleaded and proved the proper measure of damages.

The appellant complains of the admission of the exhibits on the ground that they contain data, such as chemical analyses, without any authentication or proof that the data relate to the samples of ore taken from this property, and without any proof that the analyses are correct. Also that they purport, as a whole, to show the condition of the property as of a time long prior to the transaction in question, and are at best merely extrajudicial statements of unknown persons who compiled the exhibits, and are inadmissible for these reasons. The record discloses that the objections made did not clearly present to the trial court for ruling the question of their inadmissibility on all the grounds now urged. In fact, when exhibits A, B, and C were offered, the attorney for the defendant specifically stated that he had no objection. Later, however, he asked permission to interpose an objection; which he did, and the court overruled it as the exhibits had already been admitted. Furthermore, exhibits A, B, and C were identified by Vibert as records of exploration of the Crow Wing Iron Company, showing locations of drilling holes and chemical analyses of drillings and cuttings. It therefore appears that there was extant, and apparently available to the defendant, these sources of information relative to the condition of the property. The exhibits would thus have a bearing in determining whether his statements had been recklessly made. The engineer Wolfe, who made exhibit E, accompanied by exhibit F, did not rely exclusively upon the exhibits A, B, and C, as he made a personal examination of the property. He testified as an expert, and there was neither a general objection made to the admission of his report, exhibit E, nor was it objected to on the ground of its being hearsay. It was simply objected to on the ground that there was no proper identification of the matters that the witness took into consideration in preparing his report, and that it was based upon conditions developed in 1911. The evidence shows that the samples which Wolfe took into consideration had been carefully kept and were identified, and there is no reason to suppose that the mineral character of the property had changed between 1911 and 1917. A further consideration will suffice to demonstrate that any error there might have been in connection with the admission of these exhibits is negligible, for the evidence shows

that the property had been abandoned as a mining property. The plaintiffs were induced to buy stock solely on account of the supposed utility of this property for mining purposes. The defendant is shown to have substantially admitted, in certain proceedings in Minnesota concerning the liquidation of the corporation, that the property was worthless for mining purposes; so, conceding that the exhibits contained hearsay statements that should not have been permitted to go to the jury, the error was nonprejudicial. Furthermore, the exhibits were important as bearing upon the weight of Wolfe's deposition, and were proper to be considered for that purpose; and it would have been difficult, if not impossible, to have segregated the hearsay statements from the remainder.

On the question of damages I am satisfied that no error was committed. In the complaint plaintiff alleged the false representations, and then charged that the "mine was worthless and the corporate stock of said corporation worthless;" and in alleging his damage stated that he had been "damaged in the sum of $3,000, paid by him for said corporate stock." The complaint would have been good without setting forth the particulars in which the plaintiff was damaged. Guild v. More, 32 N. D. 432, 155 N. W. 44. The evidence showed that the property was worthless as a mining property and that the stock was worthless. In the light of this proof it is immaterial whether the action of the plaintiff be considered as founded upon a rescission of the contract or upon its affirmance, as in either event he would be entitled to recover the amount paid. Furthermore, no objection was made by the defendant that the complaint did not allege the proper measure of damages, nor was the question raised during the trial upon the admission of evidence. The defendant, therefore, cannot predicate error on the measure of damages adopted at the trial.

CHRISTIANSON, Ch. J., concurs.