**HORTON et al. v. REYNOLDS et al. ***

No. 9629.

Circuit Court of Appeals, Eighth Circuit.

May 16, 1933.

*Rehearing denied June 22, 1933.

Charles M. Stilwill, of Sioux City, Iowa (Shull & Stilwill, of Sioux City, Iowa, on the brief), for appellants.

Robert B. Pike, of Sioux City, Iowa (Larned F. Brown, of Sioux City, Iowa, on the brief), for appellees.

Before STONE, GARDNER, and SANBORN, Circuit Judges.

SANBORN, Circuit Judge.

This is a suit for rescission of an exchange of real properties. The parties will be referred to as in the court below, the appellees as plaintiffs, the appellants as defendants.

The plaintiffs are husband and wife; the defendants are also husband and wife. In 1931, the plaintiff Beulah Reynolds was the owner of an apartment building and garage in Sioux City, Iowa. The defendant Anne Horton was the owner of two tracts of land, one of eighteen, the other of ninety-five, acres, in the southern or "valley" region of the state of Texas. The negotiations between the wives were conducted by their respective husbands, but no question of the husbands' authority is raised. At the time the exchange was made both the plaintiffs and the defendants were residents of Iowa.

Plaintiff John F. Reynolds, an architect of Sioux City, for some years prior to 1931 had been considering a removal to the valley region of Texas. In 1930 he answered a newspaper advertisement inserted by Horton offering to exchange the Texas holdings for land in Iowa. Later the defendants visited the Reynolds property. On that occasion Horton praised the fertility of the valley region and the condition and productivity of his wife's lands. The plaintiffs assert that he said that corn and cotton could be grown on the tracts in the summertime and all varieties of vegetables in the winter.

In October, 1930, Reynolds informed Horton that he was contemplating a trip to Texas with a view of investigating business conditions there. Horton wrote to Reynolds that a Mr. Allen in San Benito, Tex., looked after his property and would be glad to show the tracts to him if he desired. He added that it would be necessary for Reynolds to discount some of the statements made by the enthusiastic boosters of the valley region, and advised Reynolds to take sufficient time to make a thorough examination of the country.

Reynolds made the contemplated trip and spent one week in Texas. This was his first trip to that state. He was at Edinburgh for two days investigating building conditions there. He then went to San Benito. He spent three hours the first evening discussing the Horton tracts with Allen. Allen informed him that a Mexican tenant was on the ninety-five acre tract, and that he had the entire piece plowed and ready to plant. He stated that in one section carrots had already been planted, and that the rest would be devoted to tomatoes, beans, spinach, and new potatoes. He praised the fertility of the San Benito region and the richness of the Horton land and he gave estimates as to its value.

The next morning Allen and Reynolds looked at the eighteen-acre tract, and in the afternoon went to the ninety-five acre plot. The weather was cloudy and threatening; drizzles were frequent. Because of the mud, the automobile was left on the paved highway. The two men walked a mile to the site of the Horton land. Reynolds was able to observe its size and shape. Allen called Reynolds' attention to the character of the soil. The freshly plowed land presented a good appearance. It was so "wet and spongy and full of water" that they could not get over it. They stood at the edge of the tract and Allen pointed out where the carrots had been planted. The tenant was not seen. The land appeared flat and level and Reynolds did not observe the nature of the surface drainage. By walking on the unplowed ground at the side of the Horton tract, the men were able to get out to the middle line to examine the irrigation ditch. Allen explained its workings. They were about to go to the south end to investigate the drainage ditch and observe the carrots, but decided, in view of threatening weather, to return to town.

During the rest of the day Reynolds sat about the lobby of his hotel. Allen intro-

duced him to a number of Texas people. A heavy rain set in late that evening which made further expeditions into the country practically impossible. Reynolds spent the next day investigating building conditions in the valley towns. The following morning he left San Benito.

On his return to Iowa, Reynolds gave to Horton what information he had gathered about the Texas land. He said at that time that the value Horton placed on the eighteen-acre tract was far too high, that its triangular shape was a disadvantage, the house of little value, and the citrus trees not well cared for. The ninety-five acre tract he thought required too large an investment. Horton, however, reduced his trading price considerably on the larger piece, and is again said to have asserted that the land was good vegetable land and well drained.

A second trip to Texas, which Reynolds planned to make in January, 1931, and again in July of that year, was made impossible because of his business engagements. On July 9, 1931, Reynolds and Horton made an agreement for the exchange of the respective properties. Deeds for the Sioux City lot and the ninety-five acre Texas tract were exchanged about August 1, 1931, each passing subject to its outstanding mortgage. The defendants also paid the plaintiffs about $300 in cash to compensate them for releasing the income producing Iowa property on August 1st, about a month in advance of the time the plaintiffs reached Texas.

Upon his arrival in Texas, Reynolds went to the Horton tract. He made a thorough investigation of the land, made inquiries of real estate authorities, consulted the county farm agent, and interviewed recent tenants. He claims he found that surface drainage from the land into the drainage ditch was impossible because the tract was separated from the ditch by the ridge created by dirt excavated from the ditch. No cut through this ridge had been made. He learned that the slope of the land was so slight as to allow for practically no surface drainage. He discovered a base soil of very hard compact clay about twelve inches in depth, and below that a plastic clay. He found that of the lands adjoining the Horton tract only on the north were vegetables of any kind grown. Vegetable farming was engaged in with comparative success only three-quarters of a mile to the west, a mile to the south and north, and to the east only after several miles. He found that when the soil was wet it became sticky and plastic.

Reynolds was unable to acquire any professional work in Texas, as building construction there was at a standstill. The present bill was filed September 19, 1931. It charged the defendants with making misrepresentations concerning the value of the Horton tract, its productivity and its drainage, and asserted that these representations were made for the purpose of defrauding the plaintiffs of their Iowa property, and that the plaintiffs relied upon these representations and made the exchange to their injury. A decree avoiding the transaction was prayed.

There was substantial testimony, mainly in the form of depositions by San Benito farmers, that there are lands in the valley region unsuitable for vegetable crops, that the Horton Land is of this type and consists of heavy "Harlingen Clay," that it is very level, that grass and some cotton may perhaps be produced upon it. The defendants introduced considerable testimony of the same kind to the general effect that the soil on the Horton tract was suitable for some kinds of vegetables; that, while up to that time it had been poorly worked, the land was productive, and that adequate drainage facilities could be easily provided.

The court found that misstatements had been made, and concluded that, while Horton did not intentionally misrepresent the lands, Allen must be regarded as his agent. He held the plaintiffs' reliance upon the assertions made not unreasonable, even though he had visited the Texas lands. A decree for the plaintiffs was entered.

We are confronted with the following questions: (1) Are the plaintiffs, by Reynolds' visit to the Texas land, precluded from asserting reliance upon misrepresentations made by the defendants and Allen? (2) Are the defendants responsible for Allen's representations concerning the land? (3) Has fraud been shown sufficient to entitle the plaintiffs to a rescission of the exchange of property?

It is obvious that an affirmative answer to the first question will make it unnecessary for us to consider the others.

A vendee is usually under no obligation to make an investigation in order to ascertain for himself the truth or falsity of the vendor's representations. 2 Pomeroy, Equity Jurisprudence (4th Ed. 1918) § 895. He may rely upon them and act accordingly. However, if in a given case the vendee did not rely upon the statements of the vendor, there can be no rescission of the transaction upon the ground of fraud.

It is said to be the general rule that, when misrepresentations of fact regarding property are made by a vendor, and the vendee relies upon them to his injury, the transaction may be avoided or rescinded. Morel v. Masalski, 333 Ill. 41, 164 N. E. 205, 207. Hence the problem is often stated to be one solely of reliance or nonreliance, regardless of any independent investigation undertaken by the vendee.

"Where he [the vendee] makes only a partial investigation, and relies in part upon the representations of the seller, and is deceived by such representations to his injury, he may maintain an action for such deceit." Kraus v. National Bank of Commerce of Mankato, 140 Minn. 108, 110, 167 N. W. 353, 354, and cases cited; Sioux Nat. Bank v. Norfolk State Bank (C. C. A. 8) 56 F. 139; Adkins v. Potter, 211 Cal. 512, 296 P. 285; Hetland v. Bilstad, 140 Iowa, 411, 118 N. W. 422; Morain v. Tesch, 214 Mich. 699, 183 N. W. 899; Meland v. Youngberg, 124 Minn. 446, 145 N. W. 167, Ann. Cas. 1915B, 775; Moulton v. Norton, 184 Minn. 343, 344, 345, 238 N. W. 686; Burnett v. Boyer (Tex. Civ. App.) 235 S. W. 670; 61 A. L. R. 542; 1 Story, Equity Jurisprudence (14th Ed., 1918) § 284.

The reasoning behind this conclusion is that it hardly becomes one who has misrepresented facts to say that his victim should not have relied upon the fraudulent statements; that negligence on the part of the victim should not be a defense to an action of fraud; and that this rule prevents the vendor from unjustifiably escaping with the fruits of his fraud.

We prefer, however, to follow what appears to be the great weight of authority setting up as an added qualification to the above-stated general rule a provision that the vendee must have a right to rely upon the representations made before rescission will be allowed him. Morel v. Masalski, supra. Where the vendee has undertaken some kind of an individual examination of the property purchased, this question of a right to rely becomes especially pertinent.

Attwood v. Small, 6 Clark & Finnelly 232, 7 Eng. Reprs. 684, decided in the House of Lords in 1838, has proved to be a landmark for cases of this kind. There the vendee had dispatched agents to examine certain mining property he contemplated purchasing. These agents made but a cursory examination, and returned an approval. Said the Earl of Devon (pages 726, 727, of 7 Eng. Reprs.): "The purchasers had within their call the means of ascertaining the truth or falsehood of such a statement, although not from furnace books regularly kept, and * * * not having applied themselves with ordinary prudence to do this, they cannot now, especially after such a lapse of time, throw themselves upon a Court of Equity for protection. * * * The question is not as to waiver or acquiescence in fraud, but whether the parties have used that ordinary degree of vigilance and circumspection in order to protect themselves, which the law has a right to expect from those who apply for its aid." See, also, Jennings v. Broughton, 5 De G., M. & G. 126, 17 Beavan 234, 43 Eng. Reprs. 818.

Slaughter's Adm'r v. Gerson, 13 Wall. 379, 20 L. Ed. 627, concerned a representation as to the draft of a steamboat. The vendee had made an extended examination of the boat and had measured her draft. Mr. Justice Field said, page 383 of 13 Wall., 20 L. Ed. 627: "The misrepresentation which will vitiate a contract of sale, and prevent a court of equity from aiding its enforcement, must not only relate to a material matter constituting an inducement to the contract, but it must relate to a matter respecting which the complaining party did not possess at hand the means of knowledge; and it must be a misrepresentation upon which he relied, and by which he was actually misled to his injury. A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another. And the same rule obtains when the complaining party does not rely upon the misrepresentations, but seeks from other quarters means of verification of the statements made, and acts upon the information thus obtained."

Attwood v. Small, supra, was followed. In Southern Development Co. v. Silva, 125 U. S. 247, 8 S. Ct. 881, 31 L. Ed. 678, which concerned the purchase of a silver mine, it was said, page 259 of 125 U. S., 8 S. Ct. 881, 887, 31 L. Ed. 678: "Where the purchaser undertakes to make investigations of his own, and the vendor does nothing to prevent his

investigation from being as full as he chooses to make it, the purchaser cannot afterwards allege that the vendor made misrepresentations."

In Farnsworth v. Duffner, 142 U. S. 43, 47, 48, 12 S. Ct. 164, 165, 35 L. Ed. 931, the court said:

"It has been laid down by many authorities that, where the means of knowledge respecting the matters falsely represented are equally open to purchaser and vendor, the former is charged with knowledge of all that by the use of such means he could have ascertained. * * *

"But if the neglect to make reasonable examination would preclude a party from rescinding a contract on the ground of false and fraudulent representations, a fortiori is he precluded when it appears that he did make such examination, and relied on the evidences furnished by such examination, and not upon the representations."

And, in, 2 Pomeroy, Equity Jurisprudence (4th Ed. 1918) §§ 893, 895 note (4), we find:

"The same result (no right to rely) must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled. * * *

"If * * * he takes steps in an investigation, and thus obtains some independent knowledge, and afterwards concludes the agreement, he must be assumed to have concluded it upon the strength of that acquired knowledge, however partial and deceptive, and not upon the representation."

See, also, Farrar v. Churchill, 135 U. S. 609, 10 S. Ct. 771, 34 L. Ed. 246; Clark v. Reeder, 158 U. S. 505, 15 S. Ct. 849, 39 L. Ed. 1070; Shappirio v. Goldberg, 192 U. S. 232, 24 S. Ct. 259, 48 L. Ed. 419; Files v. Rankin (C. C. A. 8) 153 F. 537, 540; Dalhoff Const. Co. v. Block (C. C. A. 8) 157 F. 227, 17 L. R. A. (N. S.) 419, which would seem to cast some reflection upon Sioux Nat. Bank v. Norfolk State Bank (C. C. A. 8) 56 F. 139, supra; Tooker v. Alston (C. C. A. 8) 159 F. 599, 16 L. R. A. (N. S.) 818, both the majority opinion and the dissent of Judge Walter H. Sanborn; Woods-Faulkner & Co.

v. Michelson (C. C. A. 8) 63 F.(2d) 569, 571; Furness, Withy & Co. v. Sutherland, 58 App. D. C. 226, 26 F.(2d) 1004, cert. denied, 278 U. S. 622, 49 S. Ct. 24, 73 L. Ed. 543; Murray v. Paquin (C. C.) 173 F. 319, 329; Brown v. Smith (C. C.) 109 F. 26; Nelson v. Van Schaack & Co., 87 Colo. 199, 286 P. 865; Troutman v. Stiles, 87 Colo. 597, 290 P. 281; Hinman v. Treinen, 196 Iowa, 701, 195 N. W. 345; Boysen v. Petersen, 203 Iowa, 1073, 211 N. W. 894, which may reflect upon some of the earlier Iowa cases, infra; Heftye v. Kelley, 262 Mass. 573, 160 N. E. 426; Grindrod v. Anglo-American Bond Co., 34 Mont. 169, 85 P. 891; Reimers v. Brennan, 84 Or. 53, 164 P. 552; Hawkins v. Wells, 17 Tex. Civ. App. 360, 43 S. W. 816; Foster v. Bennett (Tex. Civ. App.) 178 S. W. 1001; Nolan v. Young (Tex. Civ. App.) 220 S. W. 154; Reed v. Hester (Tex. Civ. App.) 28 S. W.(2d) 219; Zilke v. Woodley, 36 Wash. 84, 78 P. 299; Biel v. Tolsma, 94 Wash. 104, 161 P. 1047; Mackay v. Peterson, 122 Wash. 550, 211 P. 716; Sievers v. Fuller, 181 Wis. 120, 193 N. W. 1002; 61 A. L. R. 511, 537.

The reasons behind this conclusion are sound; it is a solution of easy and flexible application; it avoids the difficult and often impossible determination of reliance in fact; it relieves the court of the character of guardian for negligent vendees; it denies protection to deliberate blindness; it involves no danger of upsetting contracts fairly entered into.

The plaintiffs, however, point out many special features in the instant case and assert that, with these present, they did have a right to rely upon the representations made. Both Reynolds and Mrs. Reynolds were, prior to the transaction in question, strangers to Texas. Reynolds had never been in the state before his visit in October, 1930. He was an architect by profession and not a farmer. He was unfamiliar with soils. The examination which he made was a hasty and cursory one. It was made between seasons, at a time one could learn from observation little of the soil's productivity and the character of the crops that could be grown. Complete knowledge of the property might not have been gained even with a thorough examination at that time. Allen was constantly present during the investigation. Reynolds' attention was directed more to the valley region as a whole than to the particular Horton land. His desire to make a second trip to Texas clearly shows nonreliance upon the results of his own initial investigation.

There is much authority holding reliance

justified where one or more of these factors is present. Where the vendee is a stranger to the intended use of the property: Herschberger v. Woodrow-Parker Co. (C. C. A. 6) 275 F. 908, certiorari denied 257 U. S. 661, 42 S. Ct. 270, 66 L. Ed. 422; Vanderbilt v. Bishop (C. C.) 188 F. 971; French v. Freeman, 191 Cal. 579, 217 P. 515; Payne v. Clow, 114 Cal. App. 597, 300 P. 138; Romine v. Thayer, 74 Ind. App. 536, 128 N. E. 456; Williams v. Hanna, 105 Kan. 540, 185 P. 17; Gugel v. Neitzel, 248 Mich. 312, 226 N. W. 869; Wendell v. Ozark Orchard Co. (Mo. App.) 200 S. W. 747; Buchanan v. Burnett, 102 Tex. 492, 119 S. W. 1141, 132 Am. St. Rep. 900; Smith v. Fletcher, 102 Wash. 218, 173 P. 19, 636; Swoboda v. Rubin, 169 Wis. 162, 170 N. W. 955; Baylies v. Vanden Boom, 40 Wyo. 411, 278 P. 551, 70 A. L. R. 924. Where the vendee is a stranger to the community: Seimer v. James Dickinson Farm Mortgage Co. (D. C.) 299 F. 651, affirmed (C. C. A. 7) 12 F. (2d) 772; Gammon v. Ealey & Thompson, 97 Cal. App. 452, 275 P. 1005; Smith v. Vincent, 90 Ind. App. 534, 169 N. E. 355; Ford v. Sims (Tex. Civ. App.) 190 S. W. 1165; Tips v. Barneburg (Tex. Civ. App.) 11 S.W.(2d) 187. Where but a cursory examination was made: Redgrave v. Hurd, L. R. 20 Ch. Div. 1, which case in 2 Pomeroy, Equity Jurisprudence (4th Ed., 1918) § 895, note (d), is termed a fresh point of departure in the English cases; Gammon v. Ealey & Thompson, supra; Omar Oil & Gas Co. v. MacKenzie Oil Co., 3 W. W. Harr. (33 Del.) 259, 138 A. 392; Romine v. Thayer, supra; Christensen v. Jauron (Iowa) 174 N. W. 499; Davis v. Walker, 191 Iowa, 1268, 183 N. W. 612, 184 N. W. 385; King v. Dykema (Iowa) 195 N. W. 233; Williams v. Hanna, supra; Wendell v. Ozark Orchard Co., supra; Robey v. Craig (Tex. Civ. App.) 172 S. W. 203; White v. Peters (Tex. Civ. App.) 185 S. W. 659; Ford v. Sims, supra; Tips v. Barneburg (Tex. Civ. App.) 11 S.W.(2d) 187, supra; Champneys v. Irwin, 106 Wash. 438, 180 P. 405; Orhmundt v. Spiegelhoff, 175 Wis. 214, 184 N. W. 692; Baylies v. Vanden Boom, supra. Where the examination was made at a time not ideal: King v. Lamborn (C. C. A. 9) 186 F. 21; Smith v. Vincent, supra; Davis v. Walker, supra; King v. Dykema, supra; Robey v. Craig, supra; White v. Peters, supra; Ohrmundt v. Spiegelhoff, supra. Where the examination, even had it been more complete, would not have led to the discovery of the falsity of the representation: Woods-Faulkner & Co. v. Michelson (C. C. A. 8) 63 F.(2d) 569; Andrieux v.

Kaeding, 47 N. D. 17, 181 N. W. 59; Tips v. Barneburg (Tex. Civ. App.) 11 S.W.(2d) 187, supra; George v. Kurdy, 92 Wash. 277, 158 P. 965. Where the vendor's agent was constantly in attendance: Kell v. Trenchard (C. C. A. 4) 142· F. 16; Herschberger v. Woodrow-Parker Co., supra; Vanderbilt v. Bishop, supra; Mather v. Barnes, Keighley & Greer (C. C.) 146 F. 1000; Seimer v. James Dickinson Farm Mortgage Co., supra; Davis v. Walker, supra; Wendell v. Ozark Orchard Co., supra. Where the court has considered knowledge not to be equally available to both parties: Turner v. Brewer, 54 App. D. C. 363, 298 F. 685; Pattiz v. Semple (D. C.) 12 F.(2d) 276, affirmed (C. C. A. 7) 18 F.(2d) 955; Sullivan v. Helbing, 66 Cal. App. 478, 226 P. 803; Stuck v. Delta L. & W. Co., 63 Utah, 495, 227 P. 791; Champneys v. Irwin, supra; 23 Corpus Juris 195.

There are, however, several opposing factors to be taken into consideration here. The Reynolds' purchase of the tract was solely for business reasons and was originally dependent upon their removal to Texas. But Reynolds failed to find professional work there. Horton had given an express warning when he advised Reynolds to make a thorough examination of conditions in the valley and to discount the claims of the enthusiastic boosters of the region. There was abundant time allowed for investigation. Nothing was done to prevent Reynolds from learning all there was to know about the land. Horton advised him that the land had not been profitable. Reynolds was, not only invited to make inquiry, but undertook to do so. His investigation of the smaller of the Horton tracts seems to have been sufficiently thorough to convince him that he did not want it. He saw enough of the larger tract to be able to ascertain its size; and yet he claims he could not then determine its slope and did not observe its sponginess and its tendency to hold water in spite of the wetness of the season and the fact that water was standing upon it. There is nothing to show that he did not make definite inquiries of neighboring landowners, former tenants, and business men. He was not prevented from making them. Allen had introduced him to several the evening of the day they had visited the tract. Judging from the depositions in the case, these people possessed knowledge of the situation. He was there to make inquiry, and the opportunity of making it was before him. Reynolds testified that he had had experience in map reading, that as an engineer he was familiar with the government geological surveys of the re-

gion describing the Horton tract as "Harlingen Clay." He admits having acquired some knowledge as a result of his own examination. And with remarkable ease, after the trade was made, he discovered all about the alleged defects in the land promptly upon his arrival in Texas. He then knew enough to inquire of real estate authorities, of the county farm agent; he talked with recent tenants and observed adjoining tracts. Finally, there is considerable testimony that the condition of the tract is not so wretched as the plaintiffs paint it; that it is suitable for some vegetables; that it is not gumbo land; that surface drainage, if not already satisfactory, could easily be made so. The testimony indicates further that Horton claimed to have no intimate knowledge of the tract, which his wife had had for a comparatively short time.

In view of Reynolds' undertaking to investigate the Texas land, and in view of the investigation which he made, although he now claims that it was inadequate and only partially relied upon, we think that the plaintiffs are precluded from claiming that it was their reliance upon the misstatements of Horton which caused them to part with their property, and that the finding of the court below that they were defrauded must be held to be unsupported by the evidence.

We base this conclusion upon the principles announced by the Supreme Court in the cases cited above. The following language from other cases is apposite: " * * * It seems to us manifest that if these conditions existed at the time of the exchange they were as readily ascertainable then as they were afterwards, and unless the court is compelled to act as the guardian of the respondent, they did not constitute actionable fraud or deceit. It must be remembered that the parties were strangers to each other and were acting at arm's length. Neither was under any disability. There was no relation of trust or confidence between them. Each was driving his own bargain. The property was at hand. Any defect in the building could be ascertained by the exercise of ordinary care." Blomquist v. Runkel, 162 Wash. 362, 298 P. 458, 459.

"Plaintiff here was a mature man, apparently intelligent, and with long practical experience as a farmer. He did not act precipitately; the negotiations extended over a considerable period at his home in Wisconsin; he was unwilling to act upon the representations there made to him, but came to California to see and investigate for himself; the property in question was not located in a remote, uninhabited region, but was in an old, thickly settled community, and close by a city of approximately 100,000 inhabitants. The land was open to his inspection, and he inspected it and appraised the surrounding conditions. Fruit growing in California is not a new or untried industry. Upon every hand, easily accessible to him, were bankers, experienced real estate men, and farmers and fruit growers of long experience in California. For many years fruit growing had been one of the principal industries of the state, and undoubtedly there were publications containing dependable data with reference thereto. Had plaintiff made wide inquiry, he would have doubtless discovered a great diversity of view as to the value of the land." Sacramento Suburban Fruit Lands Co. v. Melin (C. C. A. 9) 36 F.(2d) 907, 910.

Other analogous cases, many containing some of the special factors relied upon by the plaintiffs, are: Shappirio v. Goldberg, supra, 192 U. S. 232, 24 S. Ct. 259, 48 L. Ed. 419; the dissenting opinion of Judge Walter H. Sanborn in Tooker v. Alston (C. C. A. 8) 159 F. 599, 604, 16 L. R. A. (N. S.) 818; Curran v. Smith (C. C. A. 3) 149 F. 945; The Mattano (C. C. A. 4) 52 F. 876; Herschberger v. Woodrow-Parker Co., supra (C. C. A. 6) 275 F. 908, certiorari denied 257 U. S. 661, 42 S. Ct. 270, 66 L. Ed. 422; Sacramento Suburban Fruit Lands Co. v. Klaffenbach (C. C. A. 9) 40 F.(2d) 899; Como Orchard Land Co. v. Markham, 54 Mont. 438, 171 P. 274, 276; Rothermel v. Phillips, 292 Pa. 371, 141 A. 241; Tips v. Barneburg (Tex. Civ. App.) 276 S. W. 932, but see same case 11 S.W. (2d) 187; Jones v. Herring (Tex. Civ. App.) 16 S.W.(2d) 325; Forsyth v. Davis, 152 Wash. 595, 278 P. 676.

This conclusion renders it unnecessary to consider the other questions.

The decree of the court below is reversed, and the case remanded, with instructions to dismiss the bill.