[Sac. No. 4286. In Bank.—February 13, 1931.]

HUGH L. ADKINS, Respondent, v. G. L. POTTER et al., Appellants.

Case & Forslund, Louttit & Marceau and Louttit & Stewart for Appellants.

George A. Work and A. H. Carpenter for Respondent.

THE COURT.—This is an appeal by two of the defendants from a judgment in the plaintiff's favor in an action for damages for fraud and deceit alleged to have been practiced upon the plaintiff by all of the defendants acting in concert, by reason whereof the plaintiff was induced to exchange his real property for real property of one of the defendants. It was also alleged that the defendant vendor made certain false and fraudulent representations which also were the proximate cause of the loss sustained by the plaintiff. The jury returned a verdict in favor of two of the defendants, Edward F. Harris and Commercial and Savings Bank of Stockton, and in favor of the plaintiff in the sum of $4,750 against the remaining defendants, G. L. Potter, F. K. Potter, also designated herein as Kyle Potter, and J. B. Wilbur. From the judgment entered upon this latter verdict, the defendants G. L. Potter and F. K. Potter only appeal. The judgment has become final as to the defendant J. B. Wilbur.

The plaintiff, prior to December 12, 1924, was the owner of a lot improved by a residence and situated in Stockton. Prior to that time the defendant Kyle Potter owned a forty-two acre farm situated outside of Stockton. On that date the parties' effected an exchange of their properties upon terms which will hereinafter appear. About March, 1926, the farm, upon which in the meantime the plaintiff had moved, was sold under the terms of the deed of trust given by the plaintiff as a part of the purchase price. There-

after the plaintiff brought this action, with the result above noted.

The main contention of the appellants is that the jury's determination must necessarily be based upon a finding that the three defendants, Wilbur and the two Potters, acted in concert, and that the record is devoid of any evidence of a conspiracy among them. It is also contended that the false representations shown to have been made by Wilbur do not constitute actionable fraud.

The evidence favorable to the plaintiff on the theory of conspiracy and which in the main is the plaintiff's own testimony, is in substance as follows:

The defendant G. L. Potter had for a number of years been employed by the defendant Commercial and Savings Bank of Stockton as note teller. The plaintiff banked with the Commercial and Savings Bank of Stockton and had had other business dealings with it. In August, 1924, the plaintiff went to G. L. Potter's window at the bank and stated to Potter that he would like to exchange his equity in his Stockton property for a small piece of farming land the value of which would equal the equity in his Stockton property. G. L. Potter informed him that the bank sometimes had property to exchange, and during the same afternoon they drove out near Escalon to look at a piece containing forty acres with which the plaintiff was not satisfied because of its size and because it was not suitable to his purposes. On their return to Stockton, Potter informed the plaintiff that his brother, Kyle Potter, owned a place near Manteca and that he would arrange for the two to meet and go over the place, to which the plaintiff consented. A few days later G. L. Potter called the plaintiff by telephone and stated that he had arranged for his brother to be in the bank on a certain day and for the plaintiff to come in also. At the appointed time G. L. Potter introduced the plaintiff and Kyle Potter. The latter two then proceeded in G. L. Potter's automobile to Kyle Potter's forty-two acre farm, the same piece of property which was eventually exchanged for the plaintiff's city property, and looked it over. They also looked at another place. On the drive back to the city of Stockton they stopped at a near-by farm owned by a Mrs. Howe to inquire concerning her place. While the plaintiff waited in the automobile Kyle Potter talked to Mrs. Howe

and reported back that the owner wanted $650 an acre for her property. When the question of price for the Potter place came up, Kyle Potter told the plaintiff that he would leave the price to his brother at the bank. A day or so later the plaintiff drove by the Kyle Potter place, but he did not stop to look at it. Two or three days subsequently the plaintiff informed G. L. Potter that he was not interested in his brother's place. Thereupon G. L. Potter gave to the plaintiff a list of three or four places which the plaintiff visited by himself, but he was unable to testify that the bank had any connection with them. After a lapse of five or six weeks during which the subject of the Kyle Potter place was dropped, the plaintiff while at the bank incidentally informed G. L. Potter that he was about to close a deal for the exchange of his property for a twenty acre place on the French Camp road.

A day or two later the defendant Wilbur called upon the plaintiff at his residence. According to the plaintiff's testimony he had not met Wilbur before. Wilbur stated that he was in the bank, meaning the defendant Commercial and Savings Bank of Stockton, and that Ed Harris, who was the president of the bank, had sent him out. The plaintiff had known the defendant Ed Harris for some forty years. Wilbur stated to the plaintiff that he knew of conversations which the plaintiff had had about exchanging his place for some lands owned by the bank, that the bank was foreclosing on a sixty acre place near Lathrop belonging to a man named Duden which he thought could be handled in an exchange for his place. They drove to the place which Wilbur said was worth $60,000 and could be had for $30,000, but the plaintiff objected that he did not have that amount of money and his place was not worth it. Thereupon Wilbur told the plaintiff that it did not make any difference that he did not have the money; that Ed Harris knew him and thought a lot of him, and that the plaintiff could have any piece of land the bank owned by asking for it; that Harris had stated that the bank would finance him for any piece of property he took over; and suggested that the plaintiff put in his city property at a price of $10,000; that Ed Harris would get behind him for any amount of money that was needed to fix up the place until it was resold; that he, Wilbur, was working for the bank and had been

working for it for two years, and that when the property was resold he would divide equally with the plaintiff his fifty per cent share of the commission on the resale of which the bank retained the other fifty per cent. There was a $3,000 encumbrance on the plaintiff's place and Wilbur pointed out that the value of the $7,000 equity would be received by the plaintiff on a resale of the Duden place. The plaintiff at that time "signed up to take the (Duden) place", but he never saw the contract again nor heard anything more concerning it.

The next day Wilbur showed to the plaintiff a hundred acre tract and thereafter six or seven other pieces of property represented by him to be owned by the bank, but each time they went to see one of these places the plaintiff testified that Wilbur drove the plaintiff past Kyle Potter's farm and extolled to him good qualities which he represented that it possessed. During this period, on several occasions when the plaintiff and Wilbur were in the bank together, Wilbur went into G. L. Potter's cage and came out with slips of paper, on which the plaintiff had seen G. L. Potter write and then hand to Wilbur. Finally, while returning at one time from Manteca, Wilbur drove by the Potter place again, and this time he suggested to the plaintiff that they go in and look at it, to which the plaintiff rejoined that he had already seen it. Wilbur asked the plaintiff to look at it again, whereupon they drove into the place and looked it over. On the way back Wilbur told the plaintiff that the place was for exchange, that Kyle Potter owed the bank $16,000, that the bank was after G. L. Potter about it, and something had to be done immediately, and asked the plaintiff if he would consider an exchange on the same basis as the Duden place, and that he would get both places to fix up and resell; that the bank had 176 of these places coming in within a year and that "they" wanted the plaintiff "to fix these places up", that he would get twenty-five per cent of the commission for his services, and that the bank would finance all the places for that purpose. The plaintiff testified that Wilbur's conduct satisfied him that he was working for the bank, and that he believed all of his statements. Wilbur thereupon proposed that the plaintiff exchange his residence property at the $10,000 figure subject to the $3,000 encumbrance, and take the Potter place, which was worth

$22,000, at $20,000, and execute a deed of trust for $13,000, the difference being the value of the plaintiff's equity in his Stockton property, at the same time stating that it did not matter whether the Potter place was worth $20,000 or $40,000, or whether the plaintiff ever got a crop from it, since it would be resold within five months at the outside, when the plaintiff would have his $7,000 equity and twenty-five per cent of the commission on the resale; and that the bank would lend him $3,000, when the papers were signed to fix up the place for resale.

During this period, which was early in December, Wilbur saw the plaintiff every day. One evening, several days after the first trip to the Potter place, the plaintiff and Wilbur called at the Kyle Potter farm and discussed the possibility of making the exchange. Kyle Potter at that time said he would do something about it in a day or two. Subsequently Kyle Potter called at the plaintiff's residence and both indicated that they were ready to close the deal on the terms proposed. G. L. Potter accompanied Kyle Potter to the plaintiff's residence, where Wilbur also was present, and inquired of plaintiff how he proposed to handle the deal and whether he was satisfied to have it go through on those terms. There is testimony that the plaintiff stated that a brother of his in the east would back him, and the plaintiff admitted that he wrote to his brother, who replied that he would be unable to advance any funds.

Instruments to effect the exchange and create the encumbrance on the Potter place by deed of trust from the plaintiff to Kyle Potter for $13,000 were executed on December 12, 1924. The plaintiff continued to reside on his place in Stockton until January 8, 1925, when he moved on the Potter farm. Subsequent to December 12th the plaintiff went to G. L. Potter's window at the bank and informed him that the deal had been made and that he had come to get the $3,000 to go ahead on the place, as Wilbur had told him. The plaintiff testified that G. L. Potter told him to ''lay off the Wilbur stuff'', that he knew nothing about it and wanted nothing to do with it; that the plaintiff thereupon informed Potter that if he could not have the money he would have to call off the deal, and that Potter stated that he would have to get the money somewhere else, that the deal so far as they were concerned was closed and that

they would sue him to compel him to go through with it. Some time later negotiations were completed whereby the plaintiff gave a crop mortgage and a lien on some stock to secure advances from the bank aggregating $2,500.

There is further testimony that during the negotiations Kyle Potter represented to the plaintiff that the land was irrigable and that he had "irrigated it all over" himself; that the plaintiff had had some previous limited grain farming experience, but that he made no independent inquiries or investigation concerning the value of the Potter farm or its susceptibility to irrigation. The market value of the residence property of the plaintiff at that time is admitted by the defendants to be $8,500. The figures in evidence as to the market value of the Potter place in December, 1924, range from $10,000 to $18,000.

The plaintiff testified that he did not mention the subject of the conversations had between himself and Wilbur with respect to his prospective employment as an agent of the bank to fix up the bank's property for resale with the bank's financial backing, etc., to any of the other defendants, nor to anyone else, and that that subject was not discussed in his presence by anyone else, and that he did not make any inquiry of anyone at any time before the deal was closed as to Wilbur's authority to make any promises on behalf of the bank, although there is testimony that the plaintiff knew several of the officers and directors of the bank and that he was not prevented from making inquiry.

Other facts are presented by the record, but they are not material to the present discussion. The plaintiff defaulted in the payment of the principal of the note secured by the $13,000 deed of trust, and the farm was purchased at the trustee's sale by Kyle Potter for that sum.

We have carefully considered the contention of the plaintiff that the evidence herein narrated supports the jury's verdict, based on a finding that the two Potters were guilty of conspiring in the fraudulent representations made to the plaintiff by the defendant Wilbur, and we are compelled to the conclusion that the contention is without merit. Without entering into any prolonged analysis of the chain of events disclosed by the record, it must be said that any attempt to discover therein any evidence which creates more than the merest suspicion of concerted action would be futile.

The most that can be said is that the evidence sustains the inference that G. L. Potter was instrumental in bringing the plaintiff and Wilbur together as well as the plaintiff and Kyle Potter, but the inference that the Potters were parties to any such fraudulent representations testified to have been made by Wilbur is too remote even for conjecture. Even assuming without deciding that an inference of participation by either of the Potters in the fraudulent conduct of Wilbur could be drawn from the evidence, the inference of nonparticipation on their part is at least equally reasonable and equally susceptible. ■ If either conclusion is equally reasonably inferable, ''the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of the court or jury to draw the inference favorable to fair dealing''. (*Ryder* v. *Bamberger*, 172 Cal. 791, 799, 800 [158 Pac. 753, 756].) Therefore any responsibility on the part of the Potters for Wilbur's representations must depend on the existence of the relation between them of principal and agent.

■ It may be assumed that Wilbur was acting as the plaintiff's agent in the transaction. But the record again is devoid of any evidence that the relationship of principal and agent was created between the vendor Potter or G. L. Potter and the defendant Wilbur. No commission was paid by the Potters to Wilbur, although Wilbur received a $500 commission from the plaintiff. In fact, the record bears only the inference that Kyle Potter had constituted G. L. Potter as his agent, and the latter appeared to be acting for him throughout.

The foregoing conclusions render it unnecessary to determine whether the representations made by Wilbur constitute actionable deceit.

■ It does become necessary to consider, however, whether the representations made by Kyle Potter that all of his land was easily irrigable because he had irrigated it all over himself may support the judgment as against him. The evidence is uncontradicted that but a small proportion of the land proved to be susceptible of irrigation. That such a material inducement to the contract when, as here, it is stated as a representation of an existing fact within the knowledge of the declarer, and not merely as a matter of opinion, and which later proves to be false, becomes properly

the basis of an action in damages or for rescission cannot be questioned. (*French* v. *Freeman,* 191 Cal. 579, 586 [217 Pac. 515]; *Herdan* v. *Hanson,* 182 Cal. 538, 546 [189 Pac. 440]; *Barron Estate Co.* v. *Woodruff Co.,* 163 Cal. 561, 573 [42 L. R. A. (N. S.) 125, 126 Pac. 351]; *Crandall* v. *Parkes,* 152 Cal. 772, 776 [93 Pac. 1019]; *Palladine* v. *Imperial Valley F. L. Assn.,* 65 Cal. App. 727, 737 [225 Pac. 291]; *Edge* v. *Bryan,* 47 Cal. App. 312, 315 [190 Pac. 476].) And this is so even though the vendee has seen the property; and the vendee is not required to make independent investigation. (*French* v. *Freeman, supra; Teague* v. *Hall,* 171 Cal. 668 [154 Pac. 851]; *Palladine* v. *Imperial Valley F. L. Assn., supra.*)

The appellants contend that, nevertheless, the plaintiff did not rely on the representations as to irrigability made by Kyle Potter, but relied solely upon the representations made by the defendant Wilbur. But we are unable to perceive any merit in the contention. On the contrary, it may be said that the irrigability of the land would be considered by the vendee as one of the main and controlling elements, even under the fanciful scheme which the plaintiff testified was proposed by Wilbur, as the value of the land on resale would depend largely on its susceptibility to irrigation. The question then as to what reliance was placed by the plaintiff upon Kyle Potter's representations was one for the jury to determine.

Minor points raised by the appeal are without merit or have become unnecessary to consider in view of the foregoing discussion.

The judgment as to the appellant F. K. Potter is affirmed, and as to the appellant G. L. Potter it is reversed.

Rehearing denied.